## BURNHAM v. DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. CARRIERS—CASH FARES—EJECTING PASSENGERS.

   Where a passenger on defendant's train paid his fare, and the conductor, in placing the slip in his hat, by mistake indicated the wrong station, and later ejected the passenger who claimed that he attempted to explain the circumstances to the conductor but was not permitted to, it was not necessary for him to pay his fare the second time to avoid ejection; it also appearing that the conductor had in his possession a slip and evidence of the amount paid, which he could have readily examined and ascertained plaintiff's rights.[1]

2. SAME—EXCESSIVE DAMAGES.

   A judgment of $350 was not excessive for ejecting a passenger by the use of force, accompanied by abusive, profane, and improper language in the presence of plaintiff's wife and other passengers.

Error to Clinton; Searl, J. Submitted December 12, 1911. (Docket No. 39.) Decided December 29, 1911.

---

[1] Duty of passenger to pay fare wrongfully demanded, in order to avoid ejection, see note in 43 L. R. A. 706.

Case by Jasper A. Burnham against the Detroit, Grand Haven & Milwaukee Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harrison Geer* (*W. K. Williams*, of counsel), for appellant.

*Lyon & Moinet*, for appellee.

STONE, J. This is an action on the case, in which the plaintiff, a resident and business man of St. Johns, Mich., seeks to recover from defendant damages for a claimed wrongful ejection from one of its west-bound passenger trains, on the morning of August 26, 1910.

It appears that the plaintiff and his wife, who had been visiting near the city of Flint, came to Durand and took the defendant's west-bound train No. 19, due to leave there at 9:45 a. m., for St. Johns. Neither of them had tickets. The plaintiff's wife claims to have gone on the train, entered a car, taken her seat, and paid her fare, in money, to the conductor. The plaintiff stood on the easterly platform of the passenger coach, immediately ahead of the parlor car, described as the vestibule. There were two other gentlemen standing on the platform with him as the train left Durand; the destination of one of them was Ovid. This Ovid passenger (whose name plaintiff does not know) and plaintiff continued to ride on the platform as the train approached Vernon station, which is the first stop west of Durand. Just before the train stopped there, the conductor came to plaintiff and the other man and collected their fares. Plaintiff paid 62 cents, consisting of two quarters, one ten-cent piece, and two pennies— the proper and legal fare from Durand to St. Johns. The man destined for Ovid also paid the legal cash fare to his destination.

According to the plaintiff's claim, the conductor did not have time to give them their hat checks before the train stopped at Vernon, as it was necessary for him to get off

and attend to his train. He claims, and testified, that the conductor tore off from his pad a couple of cash-fare slips, and threw them on the platform at the plaintiff's feet; that plaintiff did not pick them up, and therefore had no cash-fare slip to show the amount of fare he had paid. After the train left Vernon, the conductor came to plaintiff and this man from Ovid, who were yet standing on the platform of the passenger coach, and took from his pocket two hat checks, wrote something upon each of them, and placed one in plaintiff's hat and one in the hat of the man from Ovid. The plaintiff testified that he did not know what the conductor wrote upon the hat check, and did not look to see.

Soon after this, the plaintiff went into the coach and took a seat, either the second or third from the east end of the coach and on the south side, sitting immediately ahead of his wife. He was somewhat afflicted with asthma, and claims that he had been suffering therefrom during the previous night, was sleepy, and soon after taking his seat fell asleep. As the train left Ovid, the conductor came through, saw plaintiff asleep, and testified that he observed plaintiff's hat check, showing that he was a passenger whose destination was Ovid. The conductor awakened the plaintiff and inquired where he was going, and was informed by plaintiff that he was going to St. Johns. The conductor told him that his hat check showed that his destination was Ovid, and that if he was going to St. Johns he would have to pay 18 cents, which was the legal fare from Ovid to St. Johns. The plaintiff informed the conductor that he had paid his fare to St. Johns in cash, and that the conductor must have made a mistake in the hat check. The conductor then asked him for his cash fare slip; and plaintiff testified that he informed the conductor that he had no cash-fare slip; that the conductor threw it on the floor when he tore it off his pad. The conductor insisted that the plaintiff should either pay the additional 18 cents, the legal fare, or leave the train at Shepardsville, the next station west of Ovid, and near which

the train was at that time. As the train reached that station, the conductor again asked plaintiff to pay his fare or leave the train. He declined to do either.

There is a good deal of conflict in the testimony as to just what occurred here. The plaintiff claims, and offered testimony in support of his claim, that he sought to explain to the conductor all of the circumstances attending the payment of his fare, but that the conductor became angry and refused to listen to him; that he swore at the plaintiff, called him a deadbeat in a loud voice, and said that he met such deadbeats every day; and that he took hold of the plaintiff in a violent manner, and ejected him from the train by force. On the other hand, the conductor claims, and testified, that, when the plaintiff declined to pay, he thereupon took hold of plaintiff with no more force than was necessary, raised him from his seat, and that plaintiff walked down the aisle and out through the east door of the passenger coach, and stepped down onto the station platform at Shepardsville. There were from 25 to 40 passengers in the car at this time.

It is undisputed that as the train started west from the station the plaintiff again boarded it, came in, and took his seat by his wife in the coach; that the conductor came through the train shortly after this, and, observing the plaintiff, said, in substance, to him: "I thought I put you off at Shepardsville." The plaintiff replied, in substance: "You did, but I got on again." The conductor then informed him that they were going in on the siding a little west of Shepardsville to permit a train to pass them, and that when they got there he would put the plaintiff off the train again, unless he paid his fare. At this point, also, there is a sharp conflict in the testimony as to just what took place, and the manner and conduct of the conductor; the plaintiff claiming, and offering testimony in support of the claim, that the conductor again made use of profane language, and in a loud tone of voice, which could be heard throughout the car, denounced the plaintiff as a deadbeat, and saying that when he put him

off the next time he (plaintiff) would stay off. While the conductor claims and testified, and offered evidence supporting his claim, that when plaintiff refused to pay the fare or leave the train, unless he was ejected therefrom, he (the conductor) thereupon took hold of plaintiff's shoulder, raised him out of his seat, and the plaintiff walked out of the train onto the ground. The train waited at this siding some minutes, and both the plaintiff and conductor, standing outside, indulged in some loud and profane language.

It is again the claim of the plaintiff that at this point the conductor asked him where he paid his fare, and that he then, for the first time, was permitted to explain to the conductor the circumstances; that he stated to the conductor there that he had paid him between Durand and Vernon, particularly stating the change which he gave him, and the circumstances of standing on the platform with the other man, and suggested to the conductor that he must have made a mistake, and put plaintiff's check in the Ovid man's hat, and the Ovid man's check in his hat. The plaintiff testifies that the conductor then said: "I remember; it is all right; get on there, and go on. You are all right; I remember it now." Whereupon he was permitted to enter the car and ride to St. Johns, and that the conductor, following him into the car, explained to those sitting near the plaintiff that there had been a mistake, but that the plaintiff had paid his fare.

On the other hand, the conductor claims, and offered testimony in support of his position, that, while standing upon the ground and talking with the plaintiff, he (plaintiff) reached into his pocket and brought out and showed to the conductor a cash-fare receipt; that he (the conductor) looked at it, and that it was for 62 cents; that thereupon the conductor reached into his own pocket and pulled out his cutter, and saw it was serially the same number; that they use a cash-fare cutter, and that they cut the cash-fare receipts off, and they are numbered serially, and he saw that that one was one of those serial

numbers that came off that cutter for that day; where-upon he apologized to the plaintiff, shook hands with him, and helped him onto the train, and told him that if he had shown him that in the first place there would have been no trouble.

The conductor testified that he took the fares just as the train was coming into Vernon; that one man was for Ovid and one for St. Johns; and that each paid cash fare. He further testified that he did not remember what he did with the cash slips, and that he could not say that the plaintiff was wrong in the statement that he threw them upon the platform. He remembered that he did not issue the hat checks at the same time that he collected the fares. He further testified as follows:

"I kept a memorandum and duplicate of cash slips to turn in, so that if I issued a cash slip for Burnham's fare and threw it on the floor I had a duplicate in my pocket. Mine would show the stations from which to which the fare was paid; and I had it right in my pocket at the time of this controversy with Mr. Burnham."

He further testified that he could not examine his cash-fare slips to see if he had a cash-fare slip corresponding with the claim of the plaintiff that he had paid his fare from Durand to St. Johns, without having the passenger's cash-fare receipt to compare with it; that he knew that 62 cents was the fare from Durand to St. Johns, and that he did not recollect at the time he testified of any other place from any of those stations west of Durand where 62 cents was the fare from that station to some point west; that his end of the slip would show the stations and the amount; that he did not examine his slips to ascertain whether he had any, and if so how many, slips showing 62 cents paid fare from Durand to St. Johns. He claims that it would have been necessary for him to have examined the hat cheeks of all the passengers to have determined that the plaintiff had paid his fare. The following occurred upon cross-examination:

"Q. If you looked at your cash checks, they would

show, if you had any, and if so how many, cash checks showing 62 cents fare paid from Durand to St. Johns, wouldn't it?

"*A.* Yes, sir.

"*Q.* And you didn't look at those, did you?

"*A.* No, sir.

"*Q.* If you really wanted to find out whether this man paid his fare from Durand to St. Johns—62 cents—you could get some light on the subject by looking at your part of the cash check, couldn't you?

"*A.* I could find out how many were paid.

"*Q.* Precisely. Do you recollect more than two upon that occasion, namely, Mrs. Burnham and Mr. Burnham, who paid cash fare from Durand to St. Johns—62 cents?

"*A.* I would not say.

"*Q.* You have no recollection of more than those two, have you?

"*A.* No, sir.   *   *   *

"*Q.* And you made no effort of any kind, character, or nature to look over your cash-fare slips you had in your possession to determine how many, if any, persons upon that train had paid cash fare from Durand to St. Johns that morning—62 cents—did you?

"*A.* No, sir."

This witness further testified that his duplicate report, made at the end of his run, showed two cash fares from Durand to St. Johns that day, one No. 77, and the next No. 78, and each of them 62 cents; that it showed that he received only two cash fares from Durand to St. Johns that day. And it also showed that he received a cash fare from Durand to Ovid, 44 cents.

"*Q.* You are not prepared to say, are you, but what those two cash fares from Durand to St. Johns upon that train were paid, the one by Mr. Burnham and the other by Mrs. Burnham?

"*A.* I would not say as to Mrs. Burnham."

The case was submitted to the jury under a very full charge by the court, and a verdict of $500 for the plaintiff was returned.

Upon a motion for a new trial, based upon the grounds that the verdict of the jury was excessive and unreason-

able, and that in no event could the plaintiff recover more than nominal damages, the circuit judge announced that he would order a new trial of the case, unless the plaintiff would accept $350 damages. The plaintiff elected to accept this, and a judgment for the plaintiff for $350 was duly entered. The defendant has brought the case to this court, and has assigned errors upon the rulings of the court in admitting testimony, upon refusals of the court to charge as requested by defendant, and upon the charge of the court.

The defendant claims (1) that the court erred in not holding that the case of *Frederick* v. *Railroad Co.*, 37 Mich. 343, and kindred cases, are controlling of the case, and that the plaintiff, not having offered to pay his fare, could not recover in the case, and that the court should have directed a verdict for the defendant, as requested; and (2) that the plaintiff could not recover, in any event, more than nominal damages.

We have examined the record with some care and find no reversible error in the rulings of the court relating to the admission of testimony, nor in the refusals to charge as requested.

From the foregoing, it will be seen that there was a sharp conflict in the testimony as to the controlling facts in the case. We are of the opinion that the case was fully and fairly submitted to the jury by the trial judge. We quote the following from the charge:

"Now, gentlemen of the jury, it does not seem to be seriously disputed here but what Mr. Burnham did actually pay his fare from Durand to St. Johns, and that he ordinarily would be entitled to ride that distance; but I charge you, as a matter of law, that that alone would not be enough to entitle him to recover here. The fact that he had actually paid his fare from Durand to St. Johns, and that he was put off the train at Shepardsville, would not be enough to entitle him to recover. It is the duty of a passenger, and was the duty of Mr. Burnham in this case, if he received this cash slip from the conductor, to retain it, and when any question was raised about his right to ride to his destination it was his duty to have produced the cash slip, if he had it; and if he didn't have it,

had lost it, or anything of that kind, it was his duty to explain to the conductor, if he was given an opportunity to do so, the circumstances under which he paid his fare. So that the first question, perhaps, that you will reach in this case will be the question of whether or not he received this cash-fare slip from the conductor. If the conductor simply threw the cash slip upon the floor, it would not be the duty of Mr. Burnham to pick it up; he would have a right to consider that the conductor didn't treat that as evidence of his right to ride, and expected to give him a hat slip, or something of that kind. He would not be obliged to reach down and pick it up. But, if the conductor handed it to him, it would be his duty to keep it and preserve it, and produce it upon request. So I charge you, as a matter of law, that if he actually did receive this cash slip, and had it at the time the controversy came up in the car there, and failed to produce it when the conductor asked for it, then, in that case, he cannot recover in this case, and your verdict should be for the defendant, no cause of action.

"That is for this reason, that, even though he had actually paid his fare, and was entitled to ride, he could not keep the cash slip in his pocket, and simply say, 'I paid my fare, and I won't pay it again;' but he must go further than that and produce the cash slip, or some explanation about it, or else he must pay his fare over again, and then collect the money back from the railroad company. His action in that case would simply be for the extra fare paid; but he could not sit there and say, 'I paid once, and I won't pay again,' or words to that effect, and not attempt to show the conductor why he had paid, and produce the receipt, if he had one, or make explanation about it, and allow himself to be put off and recover damages in this way. So you will see, if he actually had the cash slip when the controversy came up, and didn't produce it, then he cannot recover in this case.

"Now, if he didn't receive the cash slip and didn't have it, and when the controversy came up he attempted to explain to this conductor the circumstances, the conductor having taken up his hat slip—I think it is practically conceded in the case that the conductor had taken the hat slip out of his hat—he then not having any evidence of his right to ride, if he then attempted to explain to the conductor the circumstances under which he paid his fare, and the conductor refused to listen to him, shut him off, and would not listen to what he said about that, but then

and there put him off, compelled him to get off the train, then in that case he would be entitled to recover in this case. So that you will see that the real turning point in this case is the question of what took place there in the car, and whether or not, if you find he didn't have a cash slip, he made an honest effort to explain to the conductor the circumstances under which he paid his fare.

"Now, the fact that he went back on the train again, after being put off once, would not change the case in any way. If he had actually paid his fare, he would have a right to get back on there again, but the same rule would apply again when the conductor asked him for his cash slip, or more fare; it would have been his duty the second time to have explained it in the same way, and I have already laid down the rule what he should have done in that case, and if he didn't explain or produce the cash slip, if he had it, he cannot recover. If he did attempt to explain, and the conductor shut him off and would not allow him to, then he can recover."

1. We think that the meritorious question in the case is whether it is governed by *Frederick* v. *Railroad Co.*, 37 Mich. 343 (26 Am. Rep. 531), and the cases that have followed that doctrine. It is contended that, inasmuch as the plaintiff might have paid his fare, and avoided being expelled from the train, he is entitled to recover only nominal damages.

In speaking of *Frederick* v. *Railroad Co.*, *supra*, and kindred cases, Justice MONTGOMERY said, in *Zagelmeyer* v. *Railroad Co.*, 102 Mich. 214, at page 215 (60 N. W. 436, 47 Am. St. Rep. 514):

"But all the cases cited are cases in which the plaintiff had no ticket which, as between himself and the conductor, entitled him to ride upon the car in question, and in which there was no tender of the legal fare made. We think the cases of *Hufford* v. *Railroad Co.*, 53 Mich. 121 (18 N. W. 580), *Id.*, 64 Mich. 631 (31 N. W. 544, 8 Am. St. Rep. 859), fully recognize the right of the plaintiff to recover substantial damages for being evicted from the car when he either produces a ticket, or stands ready to pay the legal fare."

We have quoted from the charge to show that the jury

were instructed that, if the plaintiff actually received the cash slip, and had it at the time the controversy came up in the car, and failed to produce it when the conductor asked for it, then the plaintiff could not recover.    The jury must have found, therefore, that the plaintiff did not have this cash slip in his possession.

We think that *Frederick* v. *Railroad Co., supra,* can be distinguished from the instant case.    Here the passenger paid his legal fare in cash, and the conductor obviously made the mistake, and there was evidence that he refused to listen to an explanation which, when finally permitted to be given, set the plaintiff right, and he was permitted to continue his journey.    The case may also be distinguished from the *Frederick Case* in this:    That here the conductor had in his possession the cutter and copy, which, with a little care and examination, would have explained and made clear the whole difficulty, and there was evidence that he alone was possessed of the cash-fare receipt, or a duplicate of it.

In *Humphrey* v. *Railways Co.,* 166 Mich. 645 (132 N. W. 447), the passenger had an ambiguous or questionable ticket that needed an explanation, but she was permitted to recover, and we held that the *Frederick Case* was not applicable where an examination would have explained the matter.

In *Light* v. *Railway Co.,* 165 Mich. 433 (130 N. W. 1124), the *Frederick Case* was relied upon by the defendant, but we held that the rule, requiring a passenger to pay his fare a second time, if he has the money, should not be extended so as to compel him, if he has not the money, to endeavor to borrow it of his friends or acquaintances on the train.

2. Upon the question of the amount of judgment, we need only refer to the evidence on the part of the plaintiff, and to the two cases last above cited.    In *Humphrey* v. *Railways Co., supra,* Justice BROOKE said:

"Good faith and respectful treatment are imperative.

Insults and wanton abuse are intolerable and are action-able. Whether the conduct and language of defendant's agent in the case at bar were such as to render the de-fendant liable was a question of fact for the jury, under proper instructions."

In the instant case, there was evidence of rude, profane, and abusive language in the presence of the plaintiff's wife and other passengers on the part of the conductor, which, if believed by the jury, warranted substantial damages, and we cannot say that the judgment was ex-cessive.

We have examined the entire record with care, and are of opinion that there is no reversible error, and the judg-ment of the circuit court is affirmed.

OSTRANDER, C. J., and STEERE, MOORE, and BROOKE, JJ., concurred.