DETROIT POSTAGE STAMP SERVICE CO. *v.* SCHERMACK.

1. NOVATION—ASSIGNMENT—SALES.
> Upon testimony, not in dispute, that the defendants contracted to grant to an individual an exclusive selling agency for its stamp-vending machines in his city, that he assigned his rights to a corporation afterwards formed, and that one of the defendant firm suggested to him the

arrangement which he thus made to finance the enterprise and that the assignee proceeded to attempt performance of the contract, sending its checks signed by the original licensee as president, and defendant was not shown to have consented to release the original party to the contract, the trial court correctly held there was no evidence of a novation and no consent could be implied as against the defendants.

2. SAME—MUTUALITY—CONTRACTS.
    And there was no mutuality of obligation between the parties.

3. SAME—ASSIGNABILITY OF CONTRACT—AGENCY.
    Such a contract was unassignable, being of a personal nature and creating a relation of confidence.

4. SAME—CONSTRUCTION—EXCHANGE.
    Where it was provided in the agreement that the agent might exchange the machines purchased for a new type of vending machine, and receive credit for the price paid, on paying the difference in price in cash, an attempted exchange without payment of the cash difference was insufficient to support an action on the contract.

Error to Wayne; Mandell, J. Submitted January 27, 1914. (Docket No. 120.) Decided March 26, 1914.

Assumpsit by the Detroit Postage Stamp Service Company against Joseph J. Schermack and another for the recovery of the price paid for certain vending machines. Judgment for defendants upon a directed verdict. Plaintiff brings error. Affirmed.

*Leon D. Barlow (Walter Barlow,* of counsel), for appellant.

*Jonathan Palmer, Jr.,* for appellees.

STONE, J. This is an action of assumpsit to recover $562.50, and interest, claimed to be due the plaintiff, as representing the amount paid to defendant by the plaintiff for 37 stamp-selling machines; the defendant having failed to deliver to plaintiff 16 new twin type machines, to which the plaintiff claimed

it was entitled, in exchange for the 37 machines first mentioned, under the following contract, known as Exhibit A. On October 7, 1910, the defendants entered into a contract with Arthur F. Mercer:

"THE SCHERMACK COMPANY,
"MAILING ROOM SPECIALISTS,
"72 STATE STREET, DETROIT.
"October 7, 1910.

"MR. ARTHUR F. MERCER, City—
"*Dear Mr. Mercer:*

"Since you desire the exclusive rights of operating and selling our stamp-selling machines in this city:

"We hereby give you this exclusive privilege, providing you purchase machines from us at the following prices and terms: 25 machines of the type we now have in operation to be purchased at once for cash at $15 each; 25 machines of the same type to be purchased by Oct. 22 at $15 each, $7.50 each to be paid on delivery, and the balance of $7.50 each in 90 days; 10 machines to be purchased by Nov. 1, of the new exposed mechanism twin type using the hyphen hole perforated stamps, price of these machines to be $35, one-half of which is to be paid on delivery, and the balance in 90 days; 40 machines similar to the first 25 mentioned to be purchased by Dec. 1 for $15 each, one-half to be paid on delivery, and the balance in 90 days.

"All additional machines of the type similar to the 90 before mentioned, that is, using the specially perforated stamps, and vending the one denomination only, will be supplied for $15 cash, and all other styles and types of stamp venders will be furnished to you at our regular general agents' price, which will be fully 25% less than the regular retail price.

"At any time after six months from date you will have the privilege of exchanging machines of the old type for the new exposed mechanism twins by paying the difference in price in cash.

"We agree to the above, providing you do not operate, make, or sell any stamp venders other than those we furnish.

"We further agree to defend and save you harmless and indemnify you against any and all claims which

may be made against you on account of alleged infringement of patent rights or alleged confliction with Federal laws and expenses of any kind connected therewith arising from the use of the machines.

"Should you fail to make the payments on machines as called for above, the payments already made, if any, will apply as payments in full on as many machines as such money will purchase at the rate of $15 per machine on single machines and $35 each on twins. You of course will have the privilege of operating any machine purchased from us and fully paid for.

"We further agree to guarantee these machines against all mechanical defects and imperfections for the period of one year.

"We further agree to furnish free of charge a suitable stamp-perforating device when the one hundred machines have been purchased.

"Yours truly,

"THE SCHERMACK COMPANY,

"JOS. J. SCHERMACK.

"Accepted:   Arthur F. Mercer."

On October 11, 1910, said Arthur F. Mercer made the following assignment of the above contract, which assignment was indorsed on the back of said contract, and is known as Exhibit B:

"DETROIT, MICH., Oct. 11, 1910.

"In consideration of the issuing to me of five hundred shares of the capital stock of the Detroit Postage Stamp Service Co. in accordance with the resolution of the board of directors adopted Sept. 30, 1910, which said shares are to be issued to me in equal amount to the number of shares issued from time to time in the aggregate to the several other stockholders until said five hundred shares of stock have been fully issued to me, I hereby sell, assign, transfer, and set over to the Detroit Postage Stamp Service Co. all my right, title, and interest in and to the within instrument.

"ARTHUR F. MERCER.

"Witness:   WALTER BARLOW."

Upon the trial the above instruments were received

in evidence over the objection and exception of defendants that the same were incompetent, irrelevant, and immaterial, and showed no privity between the parties to this suit.

It appeared upon the trial that at the time of the making of the contract on October 7, 1910, the plaintiff company had not been incorporated; that the defendants knew of the subsequent organization of the plaintiff company, Mr. Mercer. its president, testifying:

· "Mr. Joseph J. Schermack was the one who put the idea into my head, and told me how to go ahead to work it up in order that I might raise capital to buy the machines from his company. The purpose of organizing the Detroit Postage Stamp Service Company was, through the understanding with Mr. Jos. J. Schermack, himself and myself, for the purpose of raising capital by which these machines could be purchased from the Schermack Company. * * * These machines were turned over by the Schermack Company to the Detroit Postage Service Company to operate under the plan that I personally had arranged with the Schermack Company to carry out. * * * I was the president of the Detroit Postage Stamp Service Company, and attended to all of those machines myself personally. I visited the places where the machines were located just as often as it was necessary to take out the money which had been paid into them, and to refill the machines with stamps. There were more machines added to the 25 machines that were turned over by the Schermack Company to the Detroit Postage Stamp Service Company. I put out 37 machines in all. They were all the same kind of machines, the same type. We got the additional 12 machines from the Schermack Company after the organization of the Detroit Postage Stamp Service Company. I had all of those machines under my own observation, all the time during the fall and winter of 1910 and the winter and spring of 1911. * * * The stock issued for this agreement I paid nothing for, only the assignment of the agreement. There was no other agreement between me personally and

the defendant copartnership, the Schermack Company, than this paper offered in evidence. There was no other agreement covering the purchase of these stamp machines from the Schermack Company other than this paper, Exhibit A, and the assignment on the back, Exhibit B, between our corporation and the defendants. There was no other agreement then or at any time by the terms of which the plaintiff assumed my obligation and my contract to pay them anything. I never got the consent in writing of the Schermack Company to make this assignment. Exhibit B was never consented to in writing by the defendants at any time. I did not at any time give them notice in writing that I intended to assign or had assigned my contract to the Detroit Postage Stamp Service Company. The plaintiff company did not pay anything to the Schermack Company for the assignment of this contract. There was no consideration whatever between them, the plaintiff and defendants."

Referring to the checks given by the plaintiff to the defendants for machines, and speaking particularly of the check of $375, dated October 12, 1910, Mr. Mercer testified:

"That was the Detroit Postage Stamp Service Company's money. My contract at that time had been turned over to the Detroit Postage Stamp Service Company. That check was given to fulfill the first payment under my contract, and was for the first 25 machines at $15 a machine. * * * It was the same with the next check, Exhibit F, payable to the order of the Schermack Company, for $187.50; that was for the next payment under this paper dated October 7, 1910, which was for half of the next installment of machines. The terms of the contract was one-half to be paid in cash, and one-half in 90 days, and so half when we took the machines was $187.50. I paid that by the Detroit Postage Stamp Service Company's check over my signature as president."

Receipts were given for these checks; but we find no evidence that the machines were billed to the plaintiff by the defendants, as claimed by the plaintiff.

The only correspondence in the record relating to the business was a letter of the defendants, dated February 7, 1911, to Mr. Mercer personally.

Referring to the claim of the plaintiff in this suit, Mr. Mercer testified that nothing beyond the $562.50 was paid; that no part of the other payments was ever made; that he returned the machines to the defendant, and demanded the twin type of machine in exchange. He testified on cross-examination:

"I returned the machines to the Schermack Company, and demanded the twin type of machines in exchange, and figured out the number of the new machines at the agreed price to equal the amount we had paid for the old ones, less $2.50, as I explained before. The $2.50 difference was coming from the Schermack Company to the Detroit Postage Stamp Service Company. I did not offer to pay any cash difference in exchange of machines. We wanted new machines of the twin type mechanism in exchange for the type which we first bought. We did not at any time during our negotiations offer to pay cash difference in price between the $35 price of the new machines and the $15 price for the old ones. That is $20 difference. I recollect the portion of the contract which says that at any time after six months from date I might have the privilege of exchanging the old machines for new ones of the new exposed mechanism twin type by paying the difference in price in cash. That was in the contract. We did not offer that difference in cash at any time.

"Q. Yet you expected to get twin type machines for the single machines, fixing the number, to make the equal value without any cash difference?

"A. According to the clause of the contract. There is another clause in the contract.

"Q. Where is that? Show me.

"A. There it is, right there.

"Q. 'Should you fail to make payments on machines as called for above, the payments already made, if any, will apply as payments in full on as many machines as such money will purchase at the rate of $15 per machine on single machines, and $35 each on

twins. You of course will have the privilege of operating any machines purchased from us and fully paid for.' Where does that give the right of exchange without paying the difference in cash? That gives you the privilege of keeping the machines you paid for.

"*A.* Or exchanging them (quoting the contract).

"*Q.* How many twin type machines had you bought? I mean twin machines as distinguished from single machines? How many single machines had you bought, or how many twins or double machines had you purchased up to that time?

"*A.* We had paid them in money equivalent to 37 single or 16 twin machines, and up to that time we had purchased the first 25 single machines, and paid for them by this $375 check. We next took 12 more under our next allotment of 25 more single machines, making 37 single machines we bought and paid for. We had no double machines. The 37 machines that we originally bought under this installment were bought and paid for. When we demanded exchange of machines we asked the Schermack Company to exchange the single machines for the double machines, without paying the cash difference."

The defendants not having delivered the 16 new machines in exchange as demanded by the plaintiff, this suit was brought to recover for the money paid under the contract. At the close of plaintiff's case the defendants moved for a directed verdict in their favor, upon the following grounds:

*First.* Because there was no privity of contract shown between the plaintiff and the defendants.

*Second.* Because in the assignment there was no agreement by the plaintiff to assume the liabilities of Mr. Mercer, and consequently no mutuality of obligation or contract existing between the plaintiff and the defendants.

*Third.* Because the alleged assignment by Mr. Mercer to the plaintiff company was made without consent in writing of the defendants, and was without consideration as between the plaintiff and the defendants.

*Fourth.* Because by the terms of the alleged assignment the plaintiff had the privilege of buying machines from the defendants, but did not assume nor have any of the liability of Arthur F. Mercer, under his contract with the defendants, and therefore, as between the plaintiff and the defendants, it became a one-sided and what is known in law as a unilateral contract, which cannot be enforced by the plaintiff, because the declaration fails to allege any promise by the defendants to the plaintiff, and the proofs fail to show any promise between the plaintiff and the defendants.

*Fifth.* Because the plaintiff has failed to make out a case under the pleadings.

The motion of defendants was granted, and the trial court directed a verdict for the defendants, upon the grounds, as we understand it, that the contract with Mr. Mercer was a personal contract, and not assignable, without the consent of the defendants, and that the evidence did not show a novation. A judgment for the defendants followed, and the plaintiff has brought the case here for review, and by its assignments of error claims that the trial court erred in directing a verdict for the defendants, and in not submitting the case to the jury.

1. It is the claim of the appellant that by the evidence the plaintiff clearly established a novation by the substitution of the plaintiff for Mr. Mercer. It will be noted that there was no conflict in the evidence here, and the question is whether, under the undisputed evidence, a novation was shown. We recognize the rule to be as stated by the plaintiff.

"It is not essential that the assent to the acceptance of the terms of novation be shown by express words to that effect; but the same may be implied from the facts and circumstances attending the transaction, and the conduct of the parties thereafter." 29 Cyc. p. 1132.

But the following should be added:

"Such consent is not to be implied merely from the performance of the contract by the substitute, for that might well consist with the continued liability of the original party; the substitute acting for that purpose in the capacity of agent for the original obligor."

This subject was discussed in the recent case of *Harrington-Wiard Co.* v. *Manufacturing Co.*, 166 Mich. 276, 286, 289 (131 N. W. 559), and what was there said is applicable here.

We find no evidence that the defendants ever agreed to substitute the plaintiff for Mr. Mercer, or that it ever released the latter from his contract. In fact, all of the dealings of the defendants were really with Mr. Mercer personally. It is true that he used the checks of the plaintiff to pay his obligations; but that was just as consistent with his continued liability as it was with a novation of parties.

2. Under the doctrine of this court, as stated in numerous cases, the situation between the plaintiff and defendants lacked mutuality of obligation or contract. *Wilkinson* v. *Heavenrich*, 58 Mich. 574 (26 N. W. 139, 55 Am. Rep. 708); *Davie* v. *Mining Co.*, 93 Mich. 491, 496 (53 N. W. 625, 24 L. R. A. 357); *Jackson* v. *Sessions*, 109 Mich. 216 (67 N. W. 315); *Hollingshead* v. *Morris*, 172 Mich. 126 (137 N. W. 527, 41 L. R. A. [N. S.] 310); *Richardson* v. *Hardwick*, 106 U. S. 252 (1 Sup. Ct. 213).

3. There is much force in the position of the defendants that the contract between Mr. Mercer and the defendants was a personal one, and not assignable, without defendants' consent. The rule is stated by Justice Gray, in *Delaware County Com'rs* v. *Safe & Lock Co.*, 133 U. S. 473 (10 Sup. Ct. 399), as follows:

"When rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should

be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract."

See, also, *Arkansas Valley Smelting Co.* v. *Mining Co.*, 127 U. S. 379 (8 Sup. Ct. 1308).

The last-cited case was commented on by this court in *Northwestern Cooperage, etc., Co.* v. *Byers*, 133 Mich. 534 (95 N. W. 529). The instant case would seem to fall within the rule stated in the *Arkansas Valley Smelting Co. Case.* See, also, *City of Marquette* v. *Wilkinson*, 119 Mich. 413 (78 N. W. 474, 43 L. R. A. 840) ; *Edison* v. *Babka*, 111 Mich. 235 (69 N. W. 499) ; *Atlantic, etc., R. Co.* v. *Railroad Co.,* 147 N. C. 368 (61 S. E. 185, 15 Am. & Eng. Ann. Cas. 363), and note at page 370; 4 Cyc. pp. 22, 23, and cases cited; 2 Am. & Eng. Enc. Law (2d Ed), p. 1035, and cases cited.

4. An insuperable objection to a recovery in this case is that, if no assignment of the contract had been made, Mr. Mercer himself could not lawfully demand the delivery of the new machines in exchange for the old ones without paying the difference in cash, and certainly the plaintiff's rights could be no greater than Mr. Mercer's under the contract. This exchange was attempted without paying the cash difference. So, in any view of the case, the result reached by the trial court was correct.

The judgment of the circuit court is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.