### C. H. LITTLE CO. *v.* CADWELL TRANSIT CO.

1. CONTRACTS—ASSIGNMENTS.
   A contract whereby a company engaged in navigation agrees to carry sand and gravel during a certain season at specified prices, the bills to be paid monthly and the contracts of sale to be assigned to the carrier as security, if demanded, is not personal and may be assigned where there have been no dealings between carrier and assignee, and there is no claim that the latter is less responsible than the assignor.

2. SAME—ASSIGNMENTS—MONOPOLIES—EVIDENCE—ADMISSIBILITY.
   In an action by an assignee on a contract, evidence that the assignment was procured for the purpose of doing

away with a competitor and is unlawful is inadmissible where there is nothing on the face of the contract or the assignment to indicate its unlawful purpose.

KUHN, C. J., and BIRD, J., dissenting.

Error to Wayne; Codd, J. Submitted April 6, 1916. (Docket No. 23.) Decided July 30, 1917. Rehearing denied September 28, 1917.

Assumpsit by the C. H. Little Company against the Cadwell Transit Company for breach of a contract to deliver sand and gravel. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed.

*Campbell, Bulkley & Ledyard* (*Henry M. Campbell* and *Charles H. L'Hommedieu*, of counsel), for appellant.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long*, of counsel), for appellee.

MOORE, J. This suit was brought to recover damages for the breach of a contract made between the B. & O. Sand & Gravel Company and the defendant, which contract was assigned by the B. & O. Sand & Gravel Company to the plaintiff. It was agreed in open court that if plaintiff was entitled to recover anything it was the sum of $2,800.

The record bears out the following statement of facts which is taken from the brief of counsel:

"The contract was entered into April 3, 1912, between the defendant and C. S. Owen and J. T. Belanger, doing business as the B. & O. Sand & Gravel Company. It was to continue during the navigation season of 1912. The Cadwell Company was the owner of the vessel C. W. Cadwell. The Cadwell Company was to 'carry sand and gravel in such quantities of approximately 500 cubic yards per week' up to the capacity of the vessel, as might be required by the B. & O. Company. The deliveries were to be made 'to the dock of the parties of the second part at De-

troit or other points as are herein provided for, having in view the Solvay Process Company dock or such other dock as is accessible and convenient to navigable waters, and for the delivery of sand and gravel on the Detroit river in the said city of Detroit, or in the River Rouge as hereinafter set out.' The price for carrying was 37 cents per yard for sand and 48, 50, and 52 cents per yard for gravel, depending upon the distance, whether within 40, 50, or 60 miles from Detroit. Payments were to be made 'for the quantities delivered during the previous month, on the twelfth day of the following month for all previous months' deliveries.' As security for payment the B. & O. Company was, 'on the request' of the Cadwell Company, to assign any contract made by the B. & O. Company for the sale of the sand and gravel being carried by the Cadwell Company. Upon the opening of navigation in 1912 the parties entered upon the performance of this contract, and so continued until October 21, 1912, at which date the B. & O. Company assigned the contract to the C. H. Little Company, of which assignment the Cadwell Company was at once given notice in writing. While the parties were engaged in the performance of the contract, the B. & O. Company made a contract wth the Superior Sand & Gravel Company under date of May 8, 1912, whereby the Superior Company was to take from the B. & O. Company 1,400 yards of gravel and 2,100 yards of sand per week during the navigation seasons of 1912, 1913, and 1914. The price for the gravel was 65 cents per yard and for the sand 43 cents. This contract was made with express reference to the Cadwell contract. It was a sale by the B. & O. Company to the Superior Company of all the sand and gravel which the Cadwell Company was to deliver to the B. & O. Company. This contract was also assigned by the B. & O. Company to the Little Company on the same day as the contract with the Cadwell Company was assigned, and the Superior Company was at once given notice in writing of such assignment.

"The Cadwell Company replied to the notice of assignment October 25, 1912, sending its reply to both the assignor (the B. & O. Company) and the assignee (the Little Company). The reply was as follows:

" 'We hereby notify you that the said assignment is in breach of the said contract, as you have no right to assign the same. We hereby declare said contract forfeited. We have further notice that the contract made between the Superior Sand & Gravel Company and yourselves has been assigned to the C. H. Little Company. We therefore further notify you that the said assignment is in breach of clause 6 of our said contract, whereby you undertake to assign to us all such contracts, as security for the payment of the sums of money due us, from time to time. We now declare the said contract made between us forfeited and of no force and effect.'

"The Superior Company at the same time replied to the notice of assignment of its contract with the B. & O. Company, stating:

" 'We hereby declare the same canceled and at an end, for the reasons: *First*, that said contract is not assignable, and *second*, because the action was taken in violation of the statutes of the State of Michigan respecting the creation of monopolies.' * * *

"During the navigation season of 1912, after October 21st, the steamer Cadwell was seen unloading sand on the Superior Company's dock. The Little Company, at the time of the taking over of these contracts, was ready to have them carried out according to their terms. If the Cadwell Company had gone on with the contract, instead of canceling it, it would have been required to deliver 3,500 yards per week for the remainder of that season in quantities of substantially 1,400 yards of gravel and 2,100 yards of sand.

"The plaintiff offered to show that if the defendant had notified the plaintiff that the defendant would not deal with the plaintiff on credit, the plaintiff would have paid cash. This was excluded. The plaintiff also offered to show that it was its intention that the Cadwell Company should go on delivering sand to the Superior Company under the contract. This likewise was excluded. With reference to the taking over of the contracts by the Little Company it appeared that the B. & O. Company approached the general manager of the Little Company, and that after consultation with the board of directors it was decided to purchase the contracts. A number of leases for sand and gravel beds were taken over at the same time. If the Little Company could not have furnished the Solvay dock

for the unloading of the gravel for any reason, the Little Company had other docks which would have answered the description in paragraph 1 of the Cadwell contract, and had railroad facilities and docks upon whch the sand and gravel could have been delivered just as conveniently as at the Solvay dock.

"The defendant, under the third paragraph of its plea, sought to introduce testimony which it was claimed would tend to show that the plaintiff did not in fact intend to carry out the contract with the Cadwell Company. This was excluded over the objection and exception of the defendant, on the ground that it was not within the averments of the plea. The defendant likewise sought to show that the plaintiff had breached the contract of the Superior Company, in that the plaintiff had refused to deliver any more gravel under the terms of the contract, or to deliver any gravel except at a higher price than in the Superior contract. This was excluded because not stated as a reason for the rescission by the Superior Company at the time it received notice of the assignment and rescinded the contract.

"Defendant further sought to show that it would not have entered into such a contract as the contract in question with the plaintiff either at the time the contract was entered into with the B. & O. Company or at the time it was assigned, and would not have made a contract extending credit to the plaintiff."

There are two questions presented for consideration:  (1) The assignability of the contract; (2) The application of the laws relating to monopolies.

1. Is the contract assignable?  Counsel say it is not consistent with the rights and interest of the contracting party to be compelled, by assignment against his will, to deal with another who, for any reason, was so objectionable that he would not originally have entered into contract relations with him. If, for example, the defendant had had business dealings with the plaintiff, and its experience had been such that, because of unfair dealings and disregard of contract obligations on the part of the plaintiff, the defendant would not

again voluntarily have entered into contract relations with such company, it clearly would be grossly unjust to compel it, without its consent and at the instance of the obnoxious party to do so. The contracting party also has a right to decide to whom he will extend credit, without giving any reason therefor.

The question of the assignability of contracts had the attention of this court in the case of *Northwestern, etc., Lumber Co.* v. *Byers,* 133 Mich. 534 (95 N. W. 529). That case came to this court from the circuit court of which Justice STONE, now of this court, was then presiding judge. He filed a written opinion in the case which reviewed the authorities so fully and accurately that it was adopted by this court. The case is so recent and so accessible that it is unnecessary to do more than refer to it.

The same question arose again in the case of *Voigt* v. *Heating Co.,* 164 Mich. 539 (129 N. W. 701). In this case the bills were payable monthly, and the heating company had the right to require security for the payment of the steam expected to be consumed. It was claimed, as in the instant case, that the contract was personal and could not be assigned. This court held otherwise, and cited the case of *Northwestern, etc., Lumber Co.* v. *Byers, supra,* and the last edition of the fifth volume of American and English Encyclopedia of Law and Practice, at pages 885, 886, and 906. It is difficult to see how the personal element entered into the contract involved here. What difference could it make to the defendant whether the sand and gravel were furnished by the B. &. O. Sand & Gravel Company or by the plaintiff.

As to the matter of payment defendant could insist upon being made secure if it thought C. H. Little & Co. was not responsible. In the instant case the plaintiff took the contract subject to the liabilities of its assignor. The defendant, if it desired, could require

an assignment of the contracts for the sale of the sand and gravel carried by the Cadwell Company. If it required such an assignment from C. H. Little Company, it would be bound to make it just the same as the B. & O. Company would have been required to make it if the contract had not been assigned by it. There is no claim that the C. H. Little Company was less responsible than the B. & O. Company, and by assigning the contract the B. & O. Company was not released from its performance. See *Northwestern, etc., Lumber Co.* v. *Byers, supra,* and *Voigt* v. *Heating Co., supra.*

Counsel say:

"The plaintiff is not entitled to enforce the assignments, even if otherwise valid, because they were obtained for an unlawful purpose."

It is urged that the assignment was procured for ths purpose of doing away with a competitor, and is therefore unlawful. It was proposed to show this by testimony outside of the written contract and the assignment. Certainly there is nothing upon the face of the contract or the assignment that would indicate an unlawful purpose. If this litigation was between the original parties to the contract, for some failure to perform, the defense attempted here could not be made. We think this feature of the case is within the principles stated in *International Harvester Co.* v. *Eaton Circuit Judge,* 163 Mich. 55 (127 N. W. 695, 30 L. R. A. [N. S.] 580, Am. & Eng. Ann. Cas. 1912A, 1022).

The other questions have been considered, but do not call for discussion.

Judgment is affirmed, with costs to appellee.

STONE, OSTRANDER, and STEERE, JJ., concurred with MOORE, J.

KUHN, C. J. (*dissenting*). On the trial of this case an offer was made by the defendant to introduce testi-

mony to show that at the time the contract was entered into, it would not have made such a contract with the C. H. Little Company, and that it would not have been willing to extend credit to that company. This testimony was excluded by the court. In my opinion this was clearly admissible under the rule announced in a case cited in the opinion of Mr. Justice MOORE, *Northwestern, etc., Lumber Co.* v. *Byers,* 133 Mich. 534 (95 N. W. 529), where Mr. Justice STONE, then circuit judge, stated the rule to be as follows:

. "I think that the true doctrine is that where an executory contract is not necessarily personal in its character, and can, *consistent with the rights and interests of the adverse party,* be fairly and sufficiently executed as well by the assignee as by the original contractor, and when the latter has not disqualified himself from a performance of the contract, it is assignable." (Italics mine.)

Exclusion of this testimony was clearly reversible error, but I am also satisfied that the court should have directed a verdict for the defendant upon the record as made, for the rule should be and is that a contracting party has the right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In my opinion it could not be said to be "consistent with the rights and interests of the adverse party" to take away from him the right to decide to whom he will extend credit. It should be borne in mind that the Superior Sand & Gravel Company, whose contract with the B. & O. Company was likewise assigned to the C. H. Little Company, was the active competitor in business of the C. H. Little Company. The effect of the assignment of the contract between the B. & O. Company and the defendant in this case was to compel the Superior Sand & Gravel Company to accept deliveries from an active competitor. *Arkansas Valley Smelting Co.* v. *Mining Co.,* 127 U. S. 379 (8 Sup. Ct. 1308) ;

*Hardy Implement Co.* v. *Iron Works*, 129 Mo. 222 (31 S. W. 599) ; *Boston Ice Co.* v. *Potter*, 123 Mass. 29 (85 Am. Rep. 9) ; *Detroit Postage Stamp Service Co.* v. *Schermack*, 179 Mich. 266 (146 N. W. 144, Am. & Eng. Ann. Cas. 1915D, 287).

Because of this conclusion it will be unnecessary to determine whether because of the lack of novation it should be said that the situation between the plaintiff and defendant lacked mutuality of obligation or contract. The judgment should be reversed, and no new trial granted, with costs to appellant.

BIRD, J., concurred with KUHN, C. J. BROOKE, J., did not sit. PERSON, J., took no part in the decision.