**In re Melindia JACKSON, Debtor.**

**No. SK 02–14533.**

United States Bankruptcy Court,
W.D. Michigan.

June 23, 2004.

Joy L. Foster, Walling & Foster, P.C., Battle Creek, MI, Kerry D. Hettinger, Hettinger & Hettinger PC, Portage, MI, for Debtor.

## OPINION

JO ANN C. STEVENSON, Bankruptcy Judge.

This matter has come before the Court on a Motion for Lift of Stay under 11 U.S.C. § 362(d)(1) and (2) filed by Settlement Capital 1997 Organization, Inc.

This Court has jurisdiction to decide this Motion under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

On September 8, 1987, Melindia Jackson (Debtor) settled a tort claim arising from an accident that occurred on or about December 8, 1984. In connection with the settlement, the Debtor received $45,000.00 and entered into a Release and Indemnity Agreement (Settlement Agreement) with Transamerica Insurance Company (Transamerica Insurance). As a funding mechanism, Transamerica Insurance bought an annuity from Transamerica Annuity Service Corporation (Transamerica Annuity) for the balance of the claim. The obligation to make the future periodic payments under the Settlement Agreement was then assigned to Transamerica Annuity.

Pursuant to the Settlement Agreement, the Debtor was to receive $300.00 per month for life, with 30 years guaranteed, from September 25, 1987 through September 25, 2017. In addition, the Debtor was to receive a lump sum payment of $5,000.00 on September 25 in the years 1993, 1997, 2002, 2007, 2012 and 2017.

On or about September 24, 1997, the Debtor entered into a Purchase and Sale Agreement (Purchase Agreement) with Settlement Capital 1997 Organization, Inc. (Settlement Capital) to "sell, assign, transfer, convey and deliver" her rights to the periodic payments under the annuity, in exchange for a lump sum payment of $20,000.00. Under the Purchase Agreement, Settlement Capital would receive the monthly payments due the Debtor from October 1, 1997 through September 30, 2007 and the lump sum payments due the Debtor on each September 25 from 2002

through 2007.[1] The Purchase Agreement further granted a security interest to Settlement Capital in all payments made to the Debtor under the annuity in order to secure the Debtor's obligations.

At the closing, Debtor executed a change of address card directing Aegon, the servicer of the annuity payments, to send payments to the Debtor to a post office box which actually belonged to Settlement Capital. By this method, Settlement Capital received payments from October 25, 1997 until June 25, 2000.[2] However, when Aegon discovered that the Debtor had sold her rights in the periodic payments, it stopped disbursing the funds. Aegon later started sending payments directly to the Debtor, but once it became aware that Settlement Capital was asserting a legal claim to the payments, Aegon withheld all payments placing them in escrow.

On December 27, 2002, Debtor filed bankruptcy under Chapter 7. Settlement Capital filed its Motion to Lift Stay on May 19, 2003. Debtor received her discharge on May 22, 2003.

Debtor admits she entered into a contractual agreement with Settlement Capital. She claims, however, the Purchase Agreement was void because the annuity conformed with IRS § 104(a)(2) and § 130(c) and the payments could not be accelerated, increased, decreased, anticipated, assigned or used as collateral for a loan.

The Debtor further contends that Texas and Michigan law both prohibit conveyance and assignment of annuity payments from an insurance contract. In addition, the Debtor claims that she purchased a cashier's check in an amount sufficient to pay Settlement Capital the amount owed, but it has not been cashed.

More compelling however, is Debtor's argument that Settlement Capital should have filed a complaint to determine the dischargeability of the debt, but failed to do so in the required time period and the claim is now time barred.

Settlement Capital argues that it is not seeking to take any action against property of the bankruptcy estate because it seeks to enforce its rights and remedies under the agreement between it and the Debtor. The annuity does not contain anti-assignment or anti-encumbrance provisions and therefore the agreement cannot be void *ab intio* as the Debtor contends. In addition, Settlement Capital disputes the argument that assignments of this kind are invalid in Texas and Michigan.

Finally, Settlement Capital claims that it is not seeking to have the debt determined nondischargeable because the payments due from Transamerica Annuity assigned to Settlement Capital are not the property of the bankruptcy estate but are property of Settlement Capital. Consequently, there is no "debt" to be discharged because the transaction was a purchase and a sale, not a loan.

*Choice of Law*

The Settlement Agreement does not contain a choice of law provision. Nonetheless, the Agreement was executed in Michigan in connection with a lawsuit then pending in Michigan. Thus it appears that Michigan law should apply to disputes arising from the Settlement Agreement. In contrast, the Purchase Agreement specifically provides that it be construed according to the laws of Texas.

---

**1.** By our calculations, this equals approximately $66,000.00.

**2.** By our calculations, Settlement Capital received roughly $9,900.00.

### The Procedural Debate

The Debtor argues that Settlement Capital has filed this Motion to Lift Stay because it failed to timely file a complaint to determine dischargeability under 11 U.S.C. § 523(a)(4) or (6) or both. Therefore Debtor argues, because Settlement Capital is attempting to enforce its claim through the back door, it should be refused entry altogether and its Motion should be denied.

Although the allegations made by Settlement Capital initially sound in fraud and/or conversion, the actions of the Debtor and the arguments made by Settlement Capital combine to tell a slightly different story, thus breathing life into the adage, "It is the circumstances and proper timing that give an action its character and make it either good or bad." Plutarch, *Plutarch's Lives, Volume II, Agesilaus,* 66 (Arthur Hugh Clough, ed., Random House, 1992).

It is clear to the Court that the Debtor's intent at the time of the Purchase Agreement was to transfer 120 monthly payments and six lump sum payments to Settlement Capital, by effecting a "qualified assignment" within the meaning of 26 U.S.C. § 130(c). This is inferred primarily through the actions of the Debtor, namely, her execution of the Purchase Agreement and the change of address cards to the post office box owned by Settlement Capital; and the Debtor's offer to Settlement Capital (which was not accepted) to pay what she believed to be the balance of the debt. A qualified assignment is also evident in the structure of the transaction itself and the numerous references to the Internal Revenue Code.

Likewise, Settlement Capital has consistently maintained that it purchased, rather than was assigned, the rights to payment owned by the Debtor. Since Settlement Capital's claim is one of outright ownership of a portion of the annuity, there was no debt to be discharged by the Debtor.

However, between the time that Aegon ceased sending payments to the post office box and before it started placing the payments in escrow, the Debtor received payments which she never forwarded to Settlement Capital. These monies, allegedly converted by the Debtor, would be properly the subject of a nondischargeability claim.[3] Because the bar date for filing a nondischargeability complaint was March 28, 2000, Settlement Capital is now precluded from pursuing the Debtor for these amounts.

Settlement Capital admits that although it initially filed a Uniform Commercial Code—1 financing statement, it subsequently lapsed and no continuation statements were ever filed. Due to this oversight, Settlement Capital can no longer proceed against the Debtor as a secured creditor in State Court. Instead it must share in the distribution with other unsecured claimants if in fact it has timely filed a claim in the bankruptcy. Otherwise, this portion of Settlement Capital's claim has been fully discharged in the bankruptcy.

As for the amount held in escrow by Aegon and its right to future payments, Settlement Capital is correct to bring attention to this issue in a Motion to Lift Stay.

### The Nature of the Settlement

When the Debtor agreed to receive payments over time in a structured settlement, she was permitted to exclude from her gross income for federal tax purposes, both the money received as personal injury damages and the investment income she would have received had she invested the

---

3. The Court has never been advised as to the dollar amount of those payments.

sum herself. The exclusion from income for damages received on account of personal injury applies to each monthly payment received under a structured settlement, provided that the taxpayer does not have actual or constructive receipt or the economic benefit of the lump-sum amount that was invested to yield that monthly payment. 26 U.S.C. § 104.

In conformity with these tax principles, the Debtor agreed that she would have no ownership interest in the annuity issued by Transamerica Annuity and that Transamerica Insurance would purchase the annuity to fund the settlement. Consequently, the purchase of the annuity is merely a matter of convenience to Transamerica Insurance and does not give the Debtor any right in the annuity itself. See *Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 840 (3rd Cir.1995)(quoting Rev. Rul. 79–220, 1979–2 C.B. 74, 1979 WL 51028).

However, even though the Debtor does not have ownership of the annuity or the right under the contract to assign the annuity payments, she may have the right to assign Transamerica Annuity's obligation to make periodic payments under the Settlement Agreement.[4] "This distinction is crucial." *In re Brooks,* 248 B.R. 99, 103 (Bankr.W.D.Mich.2000).

*The Income Stream and the Bankruptcy Estate*

Initially at issue then, is whether that portion of the annuity assigned or sold by the Debtor to Settlement Capital was part of the "legal or equitable interests of the debtor in property at the commencement of the case." 11 U.S.C. § 541(a)(1).

■ What constitutes estate property is said to be a question of federal law.

*Charles R. Hall Motors, Inc. v. Lewis (In re Lewis),* 137 F.3d 1280 (11th Cir.1998). However, property rights and interests are defined by state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Consequently, we must look to state law to determine whether the Debtor had a legal or equitable interest in the annuity on the filing date, such that the income from it is treated as estate property. In order to do this, we must determine whether the Debtor validly assigned her interest and the ownership of the annuity payments.

The Debtor's arguments focus on the anti-assignment clause found in the Settlement Agreement. She argues that she lacked authority to assign the monthly payments even though she ignored this provision when she executed the Purchase Agreement. This attempt to reverse the transaction with Settlement Capital is both disingenuous and not supported by applicable law.

■ As a general rule, contract rights and duties are assignable. *Board of Trustees of Michigan State University v. Research Corp.,* 898 F.Supp. 519 (W.D.Mich. 1995); *Selby v. Ford Motor Co.,* 405 F.Supp. 164 (E.D.Mich.1975), *aff'd* 590 F.2d 642 (6th Cir.1979); *Rodgers v. Torrent,* 111 Mich. 680, 70 N.W. 335 (1897); *Grand Traverse Convention and Visitor's Bureau v. Park Place Motor Inn, Inc.,* 176 Mich.App. 445, 440 N.W.2d 28 (1989); Restatement (Second) of Contracts § 317 (1979).

■ Notwithstanding this general rule, Michigan law recognizes certain classes of contracts as inherently nonassignable in their character, such as promises to marry, or engagements for personal

---

4. Under Michigan law, an annuity contract does not come within the definition of a "policy of insurance." See M.C.L. § 500.4000 *et seq.; Wonsey v. Life Insurance Company of North America,* 32 F.Supp.2d 939 (E.D.Mich. 1998).

services, requiring skill, science, or peculiar qualifications. That certain contractual rights and duties, such as those typically found in personal services contracts, cannot be assigned without the consent of the other party is a well-established rule of law. *Detroit Postage Stamp Service Co. v. Schermack,* 179 Mich. 266, 146 N.W. 144 (1914); *Hy King Associates, Inc. v. Versatech Manufacturing Industries, Inc.,* 826 F.Supp. 231 (E.D.Mich.1993); *Northwestern Cooperage & Lumber Co. v. Byers,* 133 Mich. 534, 95 N.W. 529 (1903); *Logical Networks, Inc. v. Murdock,* 2002 WL 31187877 (Mich.App. Oct. 1, 2002).

The Settlement Agreement here does not fall into the category of a personal services contract. Neither contracting party relied on the particular skills or abilities of the other party. The Debtor simply agreed to release her tort claims and to dismiss the state court action and Transamerica Insurance, through Transamerica Annuity, contracted to make monthly payments to the Debtor until 2017.

■ The Debtor urges the Court to determine that the anti-assignment clause in the Settlement Agreement renders inapplicable the general rule that contract rights and duties are assignable. We find however, that Michigan law mandates application of the general rule. This finding is based on the theory that once a party to a contract performs its obligations to the point that the contract is no longer executory, its right to enforce the other party's liability under the contract may be assigned without the other party's consent, even if the contract contains a non-assignment clause. *Detroit, T. & I.R. Co. v. Western Union Telegraph Co.,* 200 Mich. 2, 166 N.W. 494 (1918), *cert. denied,* 247 U.S. 517, 38 S.Ct. 581, 62 L.Ed. 1245 (1918); *Board of Trustees of Michigan State University v. Re-*

*search Corp.,* 898 F.Supp. 519 (W.D.Mich. 1995).

■ An executory contract is "a contract that remains wholly unperformed or for which there remains something still to be done on both sides." Black's Law Dictionary (8th ed.2004). With respect to the Debtor's contractual obligations, the Settlement Agreement is not executory. Immediately upon executing the Settlement Agreement, the Debtor released her claims against the state court defendants and dismissed her lawsuit with prejudice. As of the date of the Debtor's agreement with Settlement Capital, the Debtor had fully performed the duties required of her.

■ Therefore, the Debtor, having held up her end of the bargain with Transamerica Insurance, had every right to partially assign her interest in the annuity to Settlement Capital, irrespective of the anti-assignment clause. "The modern trend with respect to contractual prohibitions on assignments is to interpret them narrowly, as barring only the delegation of duties, and not necessarily as precluding the assignment of rights from assignor to assignee." *Wonsey v. Life Insurance Company of North America,* 32 F.Supp.2d 939, 943 (E.D.Mich.1998). "Unless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty or condition." Restatement (Second) of Contracts § 322(1) (1979). Consequently, we must reject the Debtor's argument that she lacked legal authority to assign her interest in the annuity.

*The Ownership of the Annuity Payments*

■ Next, we address the issue of ownership of the annuity payments. There is no dispute that the Debtor effectuated a partial assignment of her interest in the annuity to Settlement Capital.

However, the Debtor contends that the transfer gave Settlement Capital creditor status rather than ownership of the payments.

The Purchase Agreement establishes the relationship between Settlement Capital and the Debtor.[5] The intent of the parties is abundantly clear, as the Purchase Agreement is replete with references to a sales transaction. The first and most obvious indication that the parties intended a purchase and sale is that the Agreement is entitled "Purchase and Sale Agreement." In Section 1.1 it is stated: "Seller agrees to sell, assign, transfer, convey and deliver ..." Section 4.6 says: "It is the intention of the parties hereto that the provisions of this Agreement constitute a purchase and sale of all the Seller's rights ..."

Consequently, it is our inescapable conclusion that the Debtor sold her interest in the annuity to Settlement Capital, as opposed to pledging it as collateral for a loan. That Transamerica Insurance is the technical owner of the annuity does not change the outcome. What the Debtor sold to Settlement Capital was her entitlement to a portion of the annuity's income stream. As such, the payments due to Settlement Capital under the Purchase Agreement are not property of the estate.

■ In conclusion, we find that the Debtor had authority to, and in fact did, transfer her interest in the annuity. Further, that portion of the annuity's income stream purchased by Settlement Capital from the Debtor is not property of the estate. Consequently, to the extent that the Automatic Stay was in effect as to these funds, it is now lifted. However,

payments made by Aegon directly to the Debtor after the Purchase Agreement with Settlement Capital was in effect, are no longer reachable, as a complaint to determine dischargeability was not filed before the expiration of the bar date. Consequently, these amounts have been discharged by the bankruptcy.

## ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. Settlement Capital's Motion to Lift Stay is GRANTED in part and DENIED in part;

2. The automatic stay is lifted in order for Settlement Capital to proceed to collect future payments not yet received by Settlement Capital in order to fulfill its agreement entered into with the Debtor and any and all amounts currently held in escrow by Aegon;

IT IS FURTHER ORDERED that a copy of this Opinion and Order shall be served by first-class United States mail, postage prepaid upon Sandra Hamilton, Esq., Settlement Capital 1997 Organization, Inc., Melindia Jackson and Kerry Hettinger, Esq.

5. Texas law governs the Purchase Agreement. In Texas, "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *National Union Fire Insur-* *ance Co. v. CBI Industries, Inc.* 907 S.W.2d 517 (1995); *Greenwood Insurance Group, Inc. v. United States Liability Insurance Co.,* 2004 WL 1351413 (Tex.App.Hous. 1 Dist.)