*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GENERAL MEDICINE OF ILLINOIS
PHYSICIANS, PC,

UNPUBLISHED
November 9, 2023

Plaintiff/Counterdefendant-Appellee,

v

No. 361260
Oakland Circuit Court
LC No. 2020-185150-CB

CLARA AMPADU,

Defendant/Counterplaintiff-Appellant.

Before: BOONSTRA, P.J., and BORRELLO and FEENEY, JJ.

PER CURIAM.

In this action stemming from an employment dispute, defendant appeals by delayed leave granted[1] the trial court's order granting in part and denying in part the parties' cross-motions for summary disposition. For the reasons set forth in this opinion, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff General Medicine of Illinois Physicians, P.C., states that it is an Illinois professional corporation. Defendant is a nurse practitioner and a resident of Illinois. The dispute in this case involves an employment agreement that defendant entered into on February 23, 2017, with General Medicine of Illinois Nurse Practitioners, P.C. This contract was then assigned to plaintiff effective March 1, 2017. The contract contained a choice-of-law clause indicating that it would be construed in accordance with Michigan law, and the contract also contained a choice-of-forum clause providing that the parties agreed to litigate any disputes arising out of the contract in the Oakland Circuit Court.

---

[1] *General Medicine PC v Clara Ampadu*, unpublished order of the Court of Appeals, entered August 3, 2022 (Docket No. 361260).

According to the employment contract, "Employer is a party to contracts with various providers of medical services and insurance plans…which contracts require Employer to provide the Clients with assistance in staffing of medical personnel at the Client's facilities…or provide care to insurance plan or Client Facility patients...."  The contract further stated that "Employer retains physicians, nurse practitioners and other healthcare professional staff for the purpose of staffing the medical needs of Client."

Dr. Thomas Prose averred that he is the "owner and president of General Medicine, P.C. and its related entities, including General Medicine of Illinois Physicians, P.C. ('General Medicine')."  General Medicine, P.C., is a Michigan entity, and Dr. Prose has an office in Novi, Michigan.  Dr. Prose testified in his deposition that he has approximately "a dozen or so PCs" in various individual states to provide different medical services.  According to Dr. Prose,

> General Medicine is one of the nation's leading providers of post-hospitalist care. Post-hospitalist care focuses on the care of patients, usually geriatric, after the patient has been discharged from a hospital but before the patient returns home. General Medicine provides its professional and medical personnel to skilled nursing facilities, other long-term acute care facilities, and health care insurance plans in numerous states, including the state of Illinois.

Prose further averred that defendant's February 23, 2017 employment agreement was between defendant and "General Medicine" to "provide nurse practitioner services and later Regional Clinical Manager [services] through General Medicine."  General Medicine also entered into an employment agreement on August 9, 2017, with defendant's husband, Dr. Charles Ampadu, "to provide professional medical services through General Medicine."

Section 8 of defendant's 2017 employment contract, which is relevant to the issues on appeal, provides as follows:

8. **Restrictive Covenants and Remedies.**

> 8.1    Non-Solicitation.  Employee agrees that while he/she is employed by Employer and for a period of three (3) years following the termination of his/her employment with Employer for any reason (the "***Restricted Period***"), he/she will not, at any time whatsoever, for him/herself, or on behalf of any other party, directly or indirectly, contact, solicit, interfere with, disrupt or attempt to disrupt, or seek to obtain for his/her own benefit, or for the benefit of any third party, any business relationship, arrangements or contracts between Employer and any other party including, without limitation, agreements and relationships with Employer's suppliers, Clients, Client Facilities, Client Patients, agents, representatives, long term care facilities, hospitals and other parties doing business with Employer.  In addition, at no time during the Restricted Period shall Employee directly or indirectly solicit any of Employer's patients (including Client Patients), or hire or solicit for hire, whether for him/herself or on behalf of any other party, any employee of Employer or any former employee whose employment terminated during the twelve (12) month period immediately preceding such solicitation and/or hire.

8.2     Non-Disclosure.  Employee acknowledges and agrees he/she will have access to Employer's proprietary and confidential information.  Employee shall not, at any time whatsoever, directly or indirectly, use any of Employer's confidential or proprietary information except in connection with the performance of his/her duties hereunder; or disclose or disseminate any such proprietary and/or confidential information to any person not employed by Employer, except for Employer's legal, financial and accounting advisors.  All proprietary and confidential information will at all times remain the sole and exclusive property of Employer and Employee shall have no proprietary or other right in such information, whether or not such information is Employee's own work product.  As used in this Agreement, **"*Proprietary and Confidential Information*"** includes, but is not limited to, all information relating to Employer's patients (including Client Patients), the nature of Employer's services, its business strategies, contracts and operations, Employer's know-how in managing and implementing its health delivery system, including its methods of delivering health care, its method of conducting business and forms which Employer utilizes to conduct any aspect of its business.  Employee shall return to Employer all documents or electronically stored data containing Proprietary and/or Confidential Information pertaining to the above, as well as all copies, summaries and abstracts of the same, immediately upon the termination of his/her employment, or at any other time upon request.

8.3     Covenant Not to Compete.  Employee hereby covenants and agrees that during the Restricted Period (defined in Section 8.1 above), he/she shall not within twenty (20) miles of any Client and/or Client Facility and/or Client Patient in which or to whom Employer provides services in any manner, directly or indirectly, through intermediaries or other persons or entities, either as owner, shareholder, director, officer, agent, consultant, creditor, representative, investor, partner, employee, or on behalf of any other person or entity, or otherwise, compete with Employer, or engage in any business or enterprise offering any products or services similar to, or competitive with the products and services offered by Employer.

8.4     Non-Disparagement.  Both during and following the termination of this Agreement und Employee's employment (for any reason), neither Employee nor Employer shall make any Disparaging Statements (defined below) regarding the other or his/her or its services, or, with respect to Employer, regarding its products, affiliates, employees. owners or agents.  As used herein, the term **"*Disparaging Statement*"** means any disparaging or derogatory statement or comment that would constitute libel and/or slander under the laws of the State of Michigan, or any other state where Employer provides services to Clients.  Notwithstanding the foregoing, neither Employee nor Employer shall be in breach of this provision for making any truthful statements under oath in connection with any court proceeding or other legal process.

8.5     Post-Termination Obligations.  Notwithstanding the termination of this Agreement, or his/her employment, Employee shall complete medical records, cooperate with Employer in transitioning the care of patients, and cooperate on any

malpractice or other actions or suits, whether they be pending or threatened, and otherwise fulfill all responsibilities hereunder reasonably determined to relate to the services rendered by Employee prior to the termination of this Agreement; and such termination shall not affect any liability or any other obligation of Employee or Employer which may have accrued prior to such termination. Regardless of the basis of termination of this Agreement or whether this Agreement shall have expired, Employee and Employer agree that, as between them, the medical records of all patients treated by Employee while employed by Employer shall remain in the custody of Employer or Client Facility; provided that Employee shall have, consistent with all applicable law, including confidentiality requirements, reasonable access to such records upon reasonable advance notice to Employer for purposes of defending malpractice claims or other purposes determined appropriate by the Board of Directors of Employer.

8.6     Remedies. Employee acknowledges and agrees that the restrictions set forth in this Section 8 are fair and reasonable, and are reasonably required for the protection of Employer's legitimate business interests. Employee further acknowledges and agrees that in the event of a breach (or attempted breach) of any such restriction(s), Employer will be irreparably harmed and Employer's damages will be substantial and difficult, if not impossible, to ascertain, and that money damages may not afford Employer adequate relief. Accordingly. in the event of Employee's breach of any restrictive covenant(s) contained in this Agreement, Employer may seek an injunction to prevent a breach by Employee of this Agreement, and Employee agrees and consents to the imposition of such injunctive relief. The Restricted Period shall automatically be extended for a period of time equal to the time that Employee is in default of any of the restrictive covenants contained in this Section 8. Notwithstanding, if a court of competent jurisdiction finds that the time, scope or geography of the restrictive covenants contained in this Section 8 are unreasonably broad, the parties agree the court may modify each such covenant in such a way as to be enforceable and as so modified this clause shall be enforced.

8.7     Survival. The provisions of this Paragraph 8 shall survive any termination of this Agreement and Employee's employment with Employer.

Defendant explained in her deposition that the only position she held while employed by General Medicine was Regional Clinical Coordinator. In this role, her duties involved managing and scheduling the nurse practitioners and physicians that provided care at the skilled nursing facilities. Defendant testified that her direct supervisor during her employment at General Medicine was Rebecca Coccia, who was a Director of Clinical Operations, and that Dr. Prose was her next level supervisor above Coccia.[2] According to defendant, Coccia retired from General

---

[2] Nonetheless, defendant testified that she only interacted with Dr. Prose "[m]aybe five times" during the course of her employment with General Medicine.

Medicine at some point near the end of 2019. Carol Dickerson replaced Coccia as Director of Clinical Operations after Coccia's retirement.[3]

At some point in late 2019, defendant contacted Coccia about her upcoming maternity leave. Defendant received the following email from Coccia on October 30, 2019:

Good evening Clara,

In response to your email regarding your time off during your maternity, I have requested a copy of the employee information for your review please see below. Based on the policy, you may decide to use 20 days of your 2020 PTO [personal time off] for the 4 weeks and then if longer use the short term benefit and receive 60% of your salary up to the total of 8 weeks. You would then have 10 days of PTO to use for any other personal time off which may include holidays. As a coordinator, you do not carry over PTO. We understand that there is flexibility with your schedules and you have always communicated openly with your Director. We will continue to work with you throughout your pregnancy to determine your needs as well as the needs of the S. IL area and coverage for the patients. Please feel free to contact me if you have any questions or concerns.

Thank you,

Rebecca

The record contains the following General Medicine policy that appears to have been attached to the above email:

## SHORT TERM DISABILITY

If an employee becomes disabled and unable to work for a prolonged period of time, salary continuation benefits may be available under our Short Term Disability Plan. This plan is intended to provide in the case of a non-occupational injury, 4 weeks (20 work days) of salary continuation paid at 60% of the employee's base salary, beginning after a 4 week (20 work day) waiting period.

At the time the disability leave begins, any banked PTO will be used during the 4 week (20 work day) waiting period. Your PTO benefits do not continue to accrue during a leave of more than 20 days. After the 4 week (20 work day) waiting period, you will be paid 60% of your base salary up to a maximum of a [sic] 4 weeks (20 work days).

---

[3] Dickerson testified that before Coccia retired, she and Coccia were Co-Directors of Clinical Operations and that they were each responsible for operations in certain states. Dickerson took over as sole Director of Clinical Operations after Coccia retired.

**MATERNITY LEAVE**

GENERAL MEDICINE, P.C. classifies pregnancy as any other medically disabling condition. In the case of pregnancy, please inform your manger [sic] as soon as possible as of the date you and your doctor anticipates that you will begin your leave. Medical documentation, to the satisfaction of the Company may be required for all periods of time during which Short Term Disability benefits are requested. The maximum maternity leave is 8 weeks.

Section 4.3 of defendant's employment contract provided that employees were provided "Thirty (30) days[] paid time off per year, which include: all sick days, all vacation days, all continuing medical education days and all the company holidays described in Section 3.2, and which shall be taken in numbers of days and at times approved by Employer in advance." Furthermore, Section 5 of the employment contract provided in relevant part that "Employer and Employee agree that Employee's duties and responsibilities shall be furnished to Employee upon hire and as provided in the Employer'[s] Employee Manual as may be modified by Employer from time to time."

Section II.E of the General Medicine Employee Manual that defendant claimed was in effect at the relevant time provided as follows:

E. **Personal Time Off (PTO) / PTO Policy**

Any physician or nurse practitioner who remains at / or above their base patient visits for four consecutive quarters* (January - December) may choose to be reimbursed for unused PTO days. They will be reimbursed at the end of the second quarter of the following year.

• The four quarters are from January through December*

• Reimbursement is paid out at the end of the 2nd quarter of the following year

• May carry over up to five unused PTO days to the next year.

• New clinicians starting in the middle of the year - if at / or above their base may choose at the end of the 4th quarter to carry over five unused PTO days to the next year

* 1st quarter -January-March

2nd quarter - April-June

3rd quarter - July-September

4th quarter - October-December

1. **PTO** – days used are recorded in the business office.

**2.** **Conferences/Vacation** – Any time off is to be pre-approved by the employee's department head. Approved time off is subject to coordinating coverage of clinical sites. Notify the office at least **60** days in advance if taking more than **1** day off.

**a**. Fill out a "Request For Time Off" form and fax to the Business Office

**3**. **Sick Time** - When an employee is ill and unable to go to their clinical site, the following should occur:

**a.** First, inform the Physician / Nurse Practitioner you work with as soon as possible and notify the Facility if you are the only Clinician at the Facility.

**Call your regional Clinical Coordinator**

**b.** Second, fill out a PTO Request form and fax it into the office to the Director of Clinical Operations attention

A 2018 version of General Medicine's Employee Handbook, provided by plaintiff to the trial court, stated that there were 30 days of PTO per year and that a maximum of 5 days could be carried over per year. The 2018 handbook further provided in relevant part as follows:

**Eligibility**

An employee's right to receive PTO is conditional and depends on strictly meeting all of the eligibility and procedural criteria contained in this policy. PTO will be prorated based on days/worked/FTE percentage . . . .

PTO accrues on a monthly basis. Unused or banked PTO is not required to be paid upon an employee's departure from GENERAL MEDICINE, P.C. for any reason. Instead, there are various rules that apply to this unused time that are more fully described below.

\* \* \*

**Utilization**

Employees must submit requests for PTO to their immediate supervisor as far in advance as possible and as follows days used are recorded in the business office:

1. Any time off is to be pre-approved by the employee's Clinical Coordinator and final approval from Clinical Operations Director. Approved time off is subject to coordinating coverage of clinical sites.

2. Requests for one (1) or more days off must be made by completing and submitting the request form to your regional Clinical Coordinator at least **60** days

in advance. The Director of Clinical Operations will have final approval as they need to ensure fulfillment of clinical obligations. Please note: requests for time off between Memorial Day thru Labor Day may be granted up to 2 weeks and time off during Christmas holidays may be granted up to 1 week.

3. Requests for time off made less than twenty-four (24) hours prior to the start of the scheduled shift may be considered an unexcused absence, and thus not eligible for use of PTO, unless the absence is due to illness, family emergency, or severe weather. Such requests will be considered on a case-by-case basis and GENERAL MEDICINE, P.C. may require documentation from an employee to substantiate such absence. In addition, he/she must notify their Clinical Coordinator and Physician/Nurse Practitioner you work with as soon as possible and notify the facility if you are the only clinician at the facility.

4. Employees requesting three (3) or more consecutive PTO days for illness are required to provide appropriate written medical confirmation as requested by management and the Human Resources Department.

5. Every effort will be made to permit the employee to take PTO at the time requested. However, management reserves the right to use its discretion in determining whether PTO will be granted. There are instances where a prior approval of PTO may be rescinded[.]

6. Such circumstances include, but are not limited to, if the employee does not have an adequate amount of PTO to fulfill the request (GENERAL MEDICINE, P.C. will work with the employee to determine if a reduced number of PTO can be used within the original request period or if time off will be approved without pay), if the employee is on a disciplinary action plan, or if there are unforeseen GENERAL MEDICINE, P.C. business requirements that require employees to be present during preapproved PTO.

7. Requests for patterned/repetitive PTO will only be approved based on the extenuating situation of the employee.

8. An employee who requests specific PTO, which is not approved, and nevertheless fails to report to work as scheduled may be subject to disciplinary action, up to and including termination.

**Annual PTO Payout and Carry Over**

* * *

Any physician or nurse practitioner who remains at / or above their base patient visits for four consecutive quarters* (January - December) may choose to be reimbursed for unused PTO days. They will be reimbursed by the end of the second quarter of the following year.

• The four quarters are from January through December*

• Reimbursement is paid out at the end of the 2nd quarter of the following year

• May carry over up to five unused PTO days to the next year.

• New clinicians starting in the middle of the year - if at / or above their base may choose at the end of the 4th quarter to carry over five unused PTO days to the next year

\* 1st quarter - January-March

2nd quarter - April-June

3rd quarter - July-September

4th quarter- October-December

## SHORT TERM DISABILITY
If an employee becomes disabled and unable to work for a prolonged period of time, salary continuation benefits may be available under our Short Term Disability Plan. This plan is intended to provide in the case of a non-occupational injury, 4 weeks (20 work days) of salary continuation paid at 60% of the employee's base salary, beginning after a 4 week (20 work day) waiting period.

At the time the disability leave begins, any banked PTO will be used during the 4 week (20 work day) waiting period. Your PTO benefits do not continue to accrue during a leave of more than 20 days. After the 4 week (20 work day) waiting period, you will be paid 60% of your base salary up to a maximum of a 4 weeks (20 work days).

## MATERNITY LEAVE
GENERAL MEDICINE, P.C. classifies pregnancy as any other medically disabling condition. In the case of pregnancy, please inform your manger [sic] as soon as possible as of the date you and your doctor anticipate that you will begin your leave. Medical documentation, to the satisfaction of the Company may be required for all periods of time during which Short Term Disability benefits are requested. The maximum maternity leave is 8 weeks.[4]

Sandra Setser, who was employed by General Medicine as the Director of Administrative Services, testified that PTO accrued monthly, with employees accruing 2.5 days of PTO each month to reach their yearly 30 days of PTO. According to Setser, this had been the longstanding policy for accruing PTO, which meant that an employee taking maternity leave at the beginning of the calendar year would not be able to be paid during the 20-day waiting period before short-

---

[4] Hence, it appears that the maternity leave and short-term disability policies that Coccia attached to her October 30, 2019 email to defendant came from the 2018 Employee Handbook.

-9-

term disability could be used because the employee would not have accrued PTO to use during that 20-day period. She also testified that only clinical staff were permitted to carry over PTO and that coordinators, such as defendant, were not allowed to carry over PTO. Dickerson testified that the PTO policy in the Employee Handbook has "never" applied to clinical coordinators and that the PTO policy for clinical coordinators was only "verbal." According to Dickerson, the PTO policy in the handbook regarding carry over was specific to physicians and nurse practitioners "other than the clinical coordinator." Dickerson testified as follows:

> *Q*. My question is, though, how would a clinical coordinator looking at this policy know which portions of it apply to her and which do not?

> *A*. They may not be able to see it there, but they have been told.

Turning back to the factual circumstances of defendant's maternity leave, defendant sent an email on January 7, 2020, to Setser, Dickerson, and Dr. Prose stating: "Due to multiple recent complications with this pregnancy, my provider strongly urges I take maternity leave effective 1-6-2020 . . . Effective today, 1-7-2020, I need to know whom I should forward my call to, as I receive calls daily from Southern Illinois facility managers related to survey questions and etc." Defendant's estimated due date was March 29, 2020. However, defendant testified in her deposition that she did not actually start her maternity leave on January 6 or 7. Defendant explained that she subsequently received a telephone call from Dickerson, who indicated that there was nobody available to cover for defendant and asked if she could keep working and taking calls. Defendant agreed and, according to her testimony, continued to work six to seven hours a day taking calls and completing reports.[5] However, the record also contains a January 9, 2020 email from Dickerson to defendant stating in relevant part, "we are letting all the homes know about your medical leave and who to contact while you are on leave . . . . Please let us know how you are doing and take care of you and baby." Defendant replied to this email on the same day with an email stating, "Thank you." Setser testified that she did not know that defendant continued to work during January.

On January 28, 2020, defendant sent the following email to Setser and Dickerson:

Hi Sandy,

Do I need to submit vacation paper work to be paid while on maternity leave. I think according to documentation received from you and Rebecca I have 6 weeks of vacation to use then, short term disability.

My maternity status has not changed. My OB wants to try to keep baby in for another 4-5 weeks, which I don't think is gonna happen. I anticipate baby being here by end of February. But I'm not the OB just the uncomfortable mean patient.

---

[5] It appears from defendant's testimony that before her maternity leave, she was able to do most of her work from home, although she also visited facilities and saw patients. Defendant testified that in January 2020, although she continued to work, she did not leave her house to visit facilities.

Please let me know if you need anything from me.

Oh my I got steroid shot so, I now have feeling back in my hands to type.

Thank you

Defendant testified in her deposition that she was not on leave when she sent the above email but that she was trying to figure out how she would be paid once she went on leave. Defendant testified that she did not start her maternity leave until she went to the hospital on February 6, 2020.

After apparently receiving less than she expected in compensation, defendant sent the following memorandum to Setser, Dickerson, and Dr. Prose on February 27, 2020:

Prior to my maternity leave, I discussed how I would be paid with Rebecca Cocca [sic] my former supervisor until 12/31/2019. I was informed that I could not carry over my 3 weeks' vacation, and that I could use my 2020 vacation time along with short term disability. See attached email 10/30/2019.

On 1/28/2020 I emailed S. Sester [sic] with C. Dickerson cc:ed on email, requesting directions to ensure there was no lapse in my pay, I received no response. See attached email 1/28/2020.

On 2/17/2020 I phoned S. Sester [sic] to discussed [sic] why I was paid only one week, when I should still have 3 weeks of un-used vacation remaining, the 2020 vacation end of 2/2020 and any short-term disability available. I was told she was on another line and would return my call.

While in ICU I did receive a call back from the 3 of you, with some unacceptable explanation, that I could not comprehend, as Carol and Sandy both were cc: ed on Rebecca's email to me 10/30/2019.

I anticipated no loyalty after Rebecca's departure; however, I did expect General Medicine to honor the information she provided for my maternity leave.

Since there is no intention of honoring the information provided to me by Rebecca prior to her retirement, I want to be paid the balance of my 2019 vacation 3 weeks, along with resending [sic] of my entire contract with General Medicine.

The record indicates that there were discussions involving Coccia, Dickerson, and Dr. Prose about attempting to structure a compromise with defendant and that defendant indicated that she did not "see any compromise" and considered her contract rescinded since she was not "paid on 2/25/2020." On March 10, 2020, defendant sent the following email to Dr. Prose and Dickerson:

Based [on] my contract and the fact that I have not been paid any maternity leave as provided in the contract, i.e. short-term disability or my 3 remaining weeks of vacation from 2019 as provided in the emails from previous supervisor Rebecca

-11-

Cocci[a]. I am taking the position that you have breached my contract. Accordingly, because of breach of contract, I will not be performing pursuant to term of the contract. It is my position that the contract is null and void and that your breach has discharged my responsibilities under the terms and condition of the contract. Please notify all Southern Illinois facilities I am not longer employed by General Medicine, as there will be no further communication from me on behalf of General Medicine with any facility. All General Medicine equipment and supplies will be returned to General Medicine via UPS. At this point there is no uncompleted work or assignments required of me. I am will[ing] however to assist Carol with this transition in anyway necessary to ensure the Southern Illinois team receives continuity.

Defendant further explained in her deposition that although her employment contract was originally executed in February, she did not actually start working for General Medicine until May. Thus, she stated, "There's nowhere in my contract that says the start date is January and the end date is January for vacation. My contract is March. I started in May, so that's when my vacation should have started, May. So I would think I still had vacation, as my employment year had not ended." Defendant also testified that she was paid for January, but the funds were subsequently removed from her bank account. Defendant's earnings record indicates that she was issued compensation in March that was subsequently voided on the same day. Furthermore, defendant testified that she had been authorized by Coccia to use three weeks of 2018 vacation time for her vacation in 2019 and to use her 2017 vacation time in 2018.

Defendant, in her work as a nurse practitioner following her separation from General Medicine, treated patients at multiple facilities where she had previously worked while employed by General Medicine. It appears that these were not her only patients and that she also saw patients as a family nurse practitioner at the office of the company she and Dr. Ampadu owned. Dr. Ampadu had also terminated his employment with General Medicine in June 2020, and subsequently became the medical director of certain facilities where defendant had worked while employed by General Medicine. Defendant negotiated those contracts on behalf of Dr. Ampadu while she was still employed by General Medicine. According to defendant, those facilities initiated the process of recruiting Dr. Ampadu to become the medical director.

Plaintiff subsequently initiated this lawsuit in a two-count complaint for breach of contract and civil conspiracy. In its breach-of-contract claim, plaintiff alleged that defendant "has violated, and is violating, the restrictive covenants by, among other things, soliciting Client Facilities or Client Patients, soliciting General Medicine employees, disparaging General Medicine, misappropriating General Medicine's confidential or proprietary information, and by performing competitive services at Client Facilities or to Client Patients, and by assisting her husband in doing the same." In its civil-conspiracy claim, plaintiff alleged that defendant "engaged in a conspiracy with Dr. Ampadu to breach their contracts and to commit the torts" described in a parallel lawsuit plaintiff filed against Dr. Ampadu.[6] Plaintiff sought an injunction enjoining defendant from further violating the restrictive covenants, as well as "[a]ll damages" to which plaintiff was entitled.

---

[6] This parallel lawsuit is not at issue in the present case.

Defendant filed counterclaims for breach of contract and Pregnancy Discrimination in violation of the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*. In her breach-of-contract count, defendant alleged that "General Medicine agreed to pay [defendant] a base salary and provide her specific benefits, including but not limited to paid time off and disability insurance" and that "General Medicine violated the contract by not paying [defendant] as agreed." In her pregnancy discrimination count, defendant alleged that "General Medicine harassed and retaliated against [defendant] because she was pregnant; took maternity leave and had been pregnant." More specifically, defendant alleged that General Medicine discriminated against her in the terms, conditions, and privileges of her employment based on her pregnancy; that General Medicine decided not to compensate her as agreed and constructively discharged her based on her pregnancy and maternity leave; that representatives of General Medicine made "several negative comments concerning [defendant's] pregnancy"; and that "representatives of General Medicine, including Thomas Prose," harassed her while she was in the intensive care unit and under sedation.

The parties filed cross motions for summary disposition. The trial court dispensed with oral argument and issued a written opinion granting plaintiff's motion for summary disposition under MCR 2.116(C)(10) with respect to its breach-of-contract claim, granting plaintiff's motion for summary disposition on defendant's counterclaims, and granting in part defendant's motion for summary disposition by dismissing plaintiff's civil conspiracy count. The issue of plaintiff's damages was reserved for trial.

With respect to plaintiff's breach-of-contract claim, the trial court ruled that the restrictive covenants in defendant's employment contract were reasonable, that defendant breached her non-solicitation covenant by admittedly negotiating medical director contracts for her husband with General Medicine's clients while defendant was still employed by General Medicine, and that defendant breached her covenant not to compete by working at facilities that were clients of General Medicine after she terminated her employment with General Medicine.

Next, citing the rule that one who first substantially breaches a contract may not maintain an action against the other party for a subsequent breach of the contract, the trial court addressed defendant's claim that General Medicine breached the employment contract by failing to compensate defendant as agreed related to her maternity leave. The trial court ruled that there was no genuine issue of material fact that defendant "did not provide 60 days' notice or receive advance final approval for time off as required by the 2018 Employee Handbook" and that defendant instead "advised General Medicine on January 7, 2020 that she was taking her maternity leave immediately." Further, the trial court concluded that defendant was not entitled to PTO under the 2018 Employee Handbook because she "had not yet accrued any PTO to be used during the 20-workday waiting period before her short-term disability became effective." The trial court additionally ruled that there was no genuine question of material fact that defendant forfeited her short-term disability benefits under Section 4.4 of her employment contract because she terminated her contract before its term expired and without giving the amount of notice required for non-renewal.

Next, the trial court ruled that there was no evidence that defendant was constructively discharged and no evidence that she was harassed or discriminated against based on her pregnancy or maternity leave. Finally, the trial court determined that dismissal of plaintiff's claim for civil conspiracy was warranted because plaintiff's separate tort action for usurpation of corporate

-13-

opportunity against Dr. Ampadu had been dismissed and there was thus no underlying tort to support the conspiracy claim.

Defendant filed a motion for clarification. The trial court treated the motion as a motion for reconsideration and denied the motion. This appeal followed.

## II. ANALYSIS

### A. STANDING

In her appeal, defendant argues that the trial court erred by ruling that plaintiff had standing to bring this action. A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Whether a party has standing involves a question of law that is also reviewed de novo. *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). Although defendant moved for summary disposition under MCR 2.116(C)(5) on the ground that plaintiff lacked standing to assert its claims, summary disposition under that subrule is appropriate only when a party lacks the legal capacity to sue. The doctrine of standing is distinct from the capacity to sue. *Le Gassick v Univ of Mich Regents*, 330 Mich App 487, 494-495 n 2; 948 NW2d 452 (2019). A motion asserting that a party lacks standing is properly brought under MCR 2.116(C)(8) or (10). *Id.* at 494-495 n 2. Here, defendant submitted documentary evidence in support of her argument that plaintiff lacked standing. Thus, because review of a motion under MCR 2.116(C)(8) is limited to the pleadings, it is appropriate to review the standing issue under MCR 2.116(C)(10). Summary disposition is appropriate under MCR 2.116(C)(10) when, viewing the evidence submitted by the parties in the light most favorable to the party opposing the motion, "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 507; 885 NW2d 861 (2016)

"The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy.' " *Lansing Sch Ed Ass'n v Lansing Bd of Ed,* 487 Mich 349, 355; 792 NW2d 686 (2010). Standing focuses on whether a particular litigant is a proper party to request adjudication of an issue and not whether the issue is justiciable. *Id.* A litigant with a legal cause of action has standing. *Id.* at 372. A litigant can also have standing if the litigant meets the requirements for a declaratory judgment under MCR 2.605, or

> [w]here a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant. [*Lansing Sch Ed Ass'n,* 487 Mich at 372.]

Plaintiff argued that it had standing in this matter because, although it was not a party to plaintiff's employment agreement, the agreement was assigned to it by General Medicine of Illinois Nurse Practitioners, P.C. Plaintiff submitted a copy of the assignment. Defendant responded that the assignment was ineffective to confer standing on plaintiff because (1) it inaccurately identified the assignor as a Michigan corporation when it is an Illinois corporation,

(2) it inaccurately identified plaintiff as a Delaware corporation when it is an Illinois corporation, and (3) the employment agreement was a personal contract involving defendant's personal trust, special skills, and knowledge, so it required defendant's consent to be effective.

Defendant does not explain why the mistakenly identified states of incorporation of the parties should invalidate the assignment when neither party disputed that they were a party to the assignment. Instead, defendant argues that the assignment should be deemed unenforceable because the employment agreement was a contract for her personal services, and her consent was necessary to assign it. Contractual rights are generally freely assignable, unless clearly restricted. *Burkhardt v Bailey*, 260 Mich App 636, 653; 680 NW2d 453 (2004). Contracts of a personal nature, which contemplate personal association and services, are an exception to this rule and are not assignable without consent. *Northwestern Cooperage & Lumber Co v Byers*, 133 Mich 534, 537; 95 NW 529 (1903); see also *Bd of Trustees of Mich State Univ v Research Corp*, 898 F Supp 519, 521-522 (WD Mich, 1995). "Personal contracts are those involving a personal trust in a party or the special skills and knowledge of a particular individual or group of individuals." *Id*. at 522; see also *Detroit Postage Stamp Serv Co v Schermack*, 179 Mich 266, 275-276; 146 NW 144 (1914).

In this case, however, the terms of defendant's employment agreement expressly provide that it could be assigned without defendant's consent. Section 11.3 of the agreement provides:

> Assignment. Employee may not assign any of his/her rights or delegate any of his/her obligations under this Agreement without the prior written consent of Employer. However, Employer may assign all or any part of its rights and/or obligations under this Agreement without the prior consent of Employee.

Thus, defendant expressly agreed that the other party to the agreement, General Medicine of Illinois Nurse Practitioners, P.C., could assign the agreement without defendant's consent. Accordingly, defendant's consent to the assignment was not required. Because the assignment establishes plaintiff's standing to bring this action for breach of the employment agreement, the trial court did not err by rejecting defendant's argument that plaintiff lacked standing to pursue its claims.

## B. BREACH OF CONTRACT

Defendant next argues on appeal that the trial court erred by granting plaintiff's motion for summary disposition because there were genuine issues of material fact whether defendant's employer first substantially breached the employment contract by failing to compensate defendant as agreed under the terms of the employment contract with respect to the time involving defendant's maternity leave.

A trial court's ruling on summary disposition is reviewed de novo on appeal. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). The relevant legal standards for reviewing a motion under MCR 2.116(C)(10) are well settled:

> A motion under MCR 2.116(C)(10) . . . tests the *factual sufficiency* of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the

motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (citations omitted).]

Both parties in this action asserted claims for breach of contract. The construction of a contract presents a question of law that is reviewed de novo on appeal. *Shay v Aldrich*, 487 Mich 648, 656; 790 NW2d 629 (2010). However, "[w]hen deciding a motion for summary disposition in a claim for breach of contract, a court may interpret the contract only where the terms are clear. If the terms are ambiguous, a factual development is necessary to determine the intent of the parties, and summary disposition is inappropriate." *Michaels v Amway Corp*, 206 Mich App 644, 649; 522 NW2d 703 (1994). "[W]hether contract language is ambiguous is a question of law that we review de novo," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003), but "the meaning of an ambiguous contract is a question of fact that must be decided by the jury," *id*. at 469.

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "Nonperformance of an obligation due is a breach of contract even though the liability of the nonperforming party is limited or nonexistent." *Woody v Tamer*, 158 Mich App 764, 773; 405 NW2d 213 (1987).

However, a party who first breaches a contract cannot maintain an action against the other party for a subsequent breach or failure to perform. *Michaels*, 206 Mich App at 650. This rule only applies when the initial breach is substantial. *Id*. Whether a substantial breach occurred depends on whether the nonbreaching party obtained the benefit the party reasonably expected to receive. *Able Demolition, Inc v City of Pontiac*, 275 Mich App 577, 585; 739 NW2d 696 (2007). A substantial breach is one that "effect[s] such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 574; 127 NW2d 340 (1964), cert den 380 US 952; 85 S Ct 1085; 13 L Ed 2d 969 (1965) (citations omitted).

To address the parties' competing claims of breach of contract, we begin with the language of the contract to "determin[e] whether the parties' written contract contemplates the factual circumstances alleged by [the parties]." *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). Our obligation when interpreting a contract is to ascertain the intent of the contracting parties and if the contract language is unambiguous, it is "reflective of the parties' intent as a matter of law" and will be enforced as written unless contrary to public policy. *Id*.

Taking the issues chronologically, defendant alleges that the first breach occurred when she was denied compensation that she was owed under the employment contract related to her maternity leave.

As previously noted, Section 4.3 of defendant's employment contract stated that employees were provided "Thirty (30) days[] paid time off per year, which include: all sick days, all vacation days, all continuing medical education days and all the company holidays described in Section 3.2, and which shall be taken in numbers of days and at times approved by Employer in advance." Furthermore, Section 5 of the employment contract provided in relevant part that "Employer and Employee agree that Employee's duties and responsibilities shall be furnished to Employee upon hire and as provided in the Employer'[s] Employee Manual as may be modified by Employer from time to time."

The trial court concluded that there was no genuine issue of material fact that defendant "did not provide 60 days' notice or receive advance final approval for time off as required by the 2018 Employee Handbook" and that defendant instead "advised General Medicine on January 7, 2020 that she was taking her maternity leave immediately." The trial court further concluded that defendant was not entitled to PTO under the 2018 Employee Handbook because she "had not yet accrued any PTO to be used during the 20-workday waiting period before her short-term disability became effective."

First, we address the court's determination that there was no genuine issue of material fact that defendant failed to strictly comply with the requirements of the handbook for using PTO.[7] The record reflects that defendant began her maternity leave at some point between January 6 and February 6, 2020; there is conflicting evidence on this point. However, the record also contains evidence that defendant was communicating with her supervisor about her maternity leave as early as October 30, 2019, which is more than 60 days before the earliest date defendant's maternity leave may have started. On October 30, defendant received an email from her supervisor explaining the maternity leave policy and stating, "We understand that there is flexibility with your schedules and you have always communicated openly with your Director. We will continue to work with you throughout your pregnancy to determine your needs as well as the needs of the S. IL area and coverage for the patients. Please feel free to contact me if you have any questions or concerns."

The trial court's determination that General Medicine did not materially breach the contract was based on the language in the 2018 Employee Handbook stating that only five days of PTO could be carried over to the next year, that PTO accrues on a monthly basis, and that an employee's right to use PTO is conditional and requires strict compliance with all of the eligibility and procedural criteria. The trial court relied on the handbook language requiring 60 days' notice and supervisor pre-approval for using PTO. Additionally, the trial court stated that defendant had not yet accrued any PTO to use in 2020 during the 20-day waiting period before her short-term disability could take effect. The trial court acknowledged the October 30, 2019 email from Coccia in the recitation of facts in its opinion, but the court did not address this email in its analysis of the issue whether defendant's employer first breached the employment agreement. Apparently, the

---

[7] We assume for purposes of this analysis that the trial court properly considered the handbook because the employment contract expressly referred to the then-existing employee manual and expressly permitted the employer to modify it, and because the handbook expressly supersedes and replaces all prior versions.

trial court did not view this email as evidence of compliance with the 60-day notice and pre-approval provisions of the handbook, *supra*.

As the trial court observed, the handbook states that an "employee's right to receive PTO is conditional and depends on strictly meeting all of the eligibility and procedural criteria contained in this policy." This language conceivably supports the trial court's view that the October 30, 2019 email does not provide any evidence of complying with the handbook's requirements that "[r]equests for one (1) or more days off must be made by completing and submitting the request form to your regional Clinical Coordinator at least 60 days in advance" and that the "Director of Clinical Operations will have final approval" of requests for PTO.

Next, we examine the contract to ensure that the trial court gave a proper interpretation to its terms. "Our goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Kendzierski v Macomb Co*, 503 Mich 296, 311; 931 NW2d 604 (2019) (quotation marks and citation omitted). Because an unambiguous contractual provision reflects the parties' intent as a matter of law, it will be enforced as written unless it is contrary to public policy. *Quality Products*, 469 Mich at 375. However, "if the language of a contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties." *Shay*, 487 Mich at 660. Relevant extrinsic evidence that may be considered to aid in the interpretation of a contract and discern the parties' intent includes "the parties' conduct, the statements of its representatives, and past practice." *Klapp*, 468 Mich at 470 (quotation marks and citation omitted). "Looking at relevant extrinsic evidence to aid in the interpretation of a contract whose language is ambiguous does not violate the parol evidence rule." *Id*.

Here, we find the language of the contract to be ambiguous. The contract itself provides for 30 days PTO per year. The 2018 handbook refers, on the one hand, to "[a]n employee's right to receive PTO" and the process for "[e]mployees [to] submit requests for PTO." On the other hand, its provisions regarding "Annual PTO Payout and Carry Over" seem only to apply to "[a]ny physician or nurse practitioner" who satisfied certain specified conditions. Consequently, we must look to extrinsic evidence to aid in interpreting the contract. In that regard, there was conflicting evidence whether and to what extent the handbook PTO policy applied to defendant, and thus that questions of fact exist as to whether defendant was entitled to PTO. Dickerson testified that the PTO policy in the Employee Handbook has "never" applied to clinical coordinators and that the PTO policy for clinical coordinators was only "verbal." According to Dickerson, the PTO policy in the handbook regarding carry over was specific to physicians and nurse practitioners "other than the clinical coordinator." In contrast, defendant testified about how Coccia had allowed her to carry over PTO in previous years. Furthermore, Dickerson testified that clinical coordinators, such as defendant, have "great flexibility" in their work and receive "special treatment because their availability has to be greater than the average nurse practitioner or physician." Dr. Prose indicated that the PTO policy in the handbook applied to defendant.

Setser's testimony on the matter was unclear. She seemingly testified that the PTO and maternity policy as written in the handbook applied to defendant but that defendant, as a clinical coordinator, was not allowed to carry over PTO even though clinical staff could carry over PTO. According to Setser, this difference in treatment was because of the flexibility given to clinical coordinators. Setser also seemed to suggest that the PTO policy in the handbook did not apply

with respect to carrying over unused PTO because that provision only applied by its express language to nurse practitioners and physicians, which did not include the clinical coordinator. She testified further that there was no written PTO policy for clinical coordinators and "[t]hey all knew" the policy. Setser did not elaborate, or provide any clarification as to how "they all knew."

Our review of the record leads us also to conclude that questions of fact exist regarding defendant's right to a salary for working after January 7, 2020. It was plaintiff's position that defendant did not work after January 7, 2020. However, defendant testified that Dickerson asked her to continue to handle telephone calls after January 7, and defendant said that she continued to work essentially full time after January 7 until February 6, 2020. Although Dickerson denied that she asked defendant to continue to work, the conflicting testimony establishes a question of fact whether defendant continued to work, with plaintiff's knowledge, until February 6, 2020. There is also evidence that plaintiff initially paid defendant for work during this period by directly depositing her pay into defendant's bank account, but then later withdrew the proceeds. This evidence establishes questions of fact whether defendant continued to work after January 7 with plaintiff's knowledge and was not paid for that work.

With regard to defendant's entitlement to short-term disability benefits, again, the record is replete with questions of fact regarding when any such benefits would have started. If, as plaintiff claims, defendant stopped working on January 7, 2020, she should have qualified for short-term disability benefits after 20 work days (with or without the use of PTO days), which would have been before February 6, 2020, and well before she decided to leave her position.

Defendant argues that it was plaintiff who first breached the employment agreement by failing to comply with the following terms of the agreement:

> 4. **Benefits**. Employer agrees to provide Employee with the following benefits:
>
> * * *
>
> 4.3 Thirty (30) days, paid time off per year, which include: all sick days, all vacation days, all continuing medical education days and all the company holidays described in Section 3.2, and which shall be taken in numbers of days and at times approved by Employer in advance.
>
> 4.4 All employee benefits paid or provided by Employer to Employee, whether or not expressly enumerated in this Agreement or *Exhibit A*, may be retained by Employee only in the event Employee completes (or timely gives notice of non-renewal of) the entire Term of this Agreement during which such benefits were paid. In the event this Agreement is terminated for any reason by either party prior to the expiration of the Term of the Agreement, the Employee shall be liable to the Employer for repayment of the value of all such cash benefits received during the term of this Agreement, and the Employee authorizes the Employer to deduct from Employee's salary and pay check(s) such amounts advanced by Employer for said benefits on behalf of or to Employee.

Exhibit A to the agreement included that defendant received PTO of "30 days per year includes 6 holidays." She also was entitled to short-term disability after "20-work day waiting period (use PTO)" or "30-work day coverage of 60% of base."

The trial court held that plaintiff did not first breach the employment agreement by failing to pay defendant benefits and salary she was due, stating:

> Also, at stake is whether the Plaintiff first materially breached the Employment Agreement by allegedly failing to pay Clara PTO, short-term disability and by constructively discharging her from her employment? Because Clara failed to provide timely notice to use any PTO, forfeited her short-term disability, and admits she was never fired and the Plaintiff never suggested her position would change after she returned from maternity leave, the answer is "no."

Defendant argues that the trial court erred by failing to find that plaintiff was responsible for first breaching the employment agreement, which would thereby preclude plaintiff from prevailing on its own breach-of-contract claim against defendant for violation of the restrictive covenants.

Citing *Coates v Bastian Bros, Inc*, 276 Mich App 498; 741 NW2d 539 (2007), plaintiff argues that the first-breach doctrine does not apply in this case. In *Coates*, this Court stated, in pertinent part:

> Plaintiff next argues that Bentley was barred from enforcing the noncompetition clause because, under the jury's verdict, Bentley was the first to materially breach the employment contract. Plaintiff cites *Michaels v Amway Corp*, 206 Mich App 644, 650; 522 NW2d 703 (1994) (" '[O]ne who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach . . .' ") (citation omitted). We disagree.

* * *

(b)

> Alternatively, the plain language of the noncompetition clause vitiates the first-breach doctrine: "Employee will not for a period of one (1) year after termination of employment with the Company, *regardless of the reason for termination of employment*, participate . . . in any enterprise in competition with the Company." (Emphasis added.) We hold that this provision is not ambiguous, because it is not susceptible to more than one interpretation and does not conflict with any other provision. Plaintiff was barred from competing with Bentley, *regardless of the reason for the termination of plaintiff's employment*. In other words, *even though* plaintiff's employment was terminated *without* cause, plaintiff was still barred from working for a competitor for one year. Thus, under this clause's plain terms, plaintiff cannot argue that because her employment was terminated without cause, Bentley was barred from enforcing the noncompetition clause. Such an interpretation contravenes the plain terms of the clause and

-20-

therefore must be rejected.  Bentley is entitled to the benefit of its unambiguous bargain.

> We respect the parties' freedom of contract.  Here, the parties opted out of the first-breach doctrine by using the language "regardless of the reason for termination of employment."  The parties are free to avoid, by contract, what might otherwise be an applicable rule of law.  [*Coates*, 276 Mich App at 509-511 (footnotes and citations omitted; emphasis in original).]

Plaintiff argues that this case is like *Coates* because defendant's employment agreement contains the following paragraph:

> 8.7   <u>Survival</u>.   The provisions of this Paragraph 8 shall survive any termination of this Agreement and Employee's employment with Employer.

The terms of defendant's employment agreement clearly provide that she remained subject to the restrictive covenants even if the agreement is terminated.  Therefore, defendant cannot avoid enforcement of the restrictive covenants even if plaintiff was the first party to breach the agreement by failing to pay defendant in accordance with the agreement.

Moreover, even if the restrictive covenants extend beyond the contract and may still be enforced by plaintiff, for the reasons explained earlier, there are questions of fact whether plaintiff first breached the agreement by failing to pay defendant her salary and/or PTO and disability benefits.  If defendant continued to work at plaintiff's request, as she claimed, and plaintiff refused to pay defendant for that work, that could qualify as a substantial breach, at least to excuse the requirement that defendant continue to work for plaintiff or possibly provide 150 days' notice before terminating the agreement.  If plaintiff refused to compensate defendant according to the terms of their agreement, defendant would have been justified in seeking other employment, given that defendant's expectation of compensation for her work can be considered an essential purpose of the agreement.

Defendant also argues that the trial court erred to the extent that it found that she was not constructively discharged, and left her employment voluntarily.  Constructive discharge is a defense to a claim that a party left employment voluntarily. *Jewett v Mesick Consol Sch Dist*, 332 Mich App 462, 471; 957 NW2d 377 (2020). "A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Id*. at 471-472.  The trial court rejected defendant's claim that she was constructively discharged, stating:

> Clara alleges that she was constructively discharged from her employment on March 10, 2020.  Yet, in correspondence dated February 27, 2020 and February 28, 2020, Clara stated she was rescinding her Employment Agreement.  Clara alleges she was constructively discharged when she [was] no longer employed by the Plaintiff—a nonsensical position.

Moreover, there is no evidence Clara's working conditions were difficult or unpleasant. Clara testified that she was never fired and the Plaintiff never suggested her position would change after she returned from maternity leave:

> *Q.* While you're getting to 29—actually, Clara, before you get there, because maybe we don't need to use the complaint, I'll just ask you, did anyone at General Medicine ever tell you that you wouldn't return to work?
>
> *A.* No.
>
> *Q.* They never fired you, right?
>
> *A.* No.
>
> *Q.* And they never suggested to you that you were on the brink of being fired so you might as well just quit, right?
>
> *A.* No.
>
> *Q.* And did they ever suggest to you that when you did return to work, that your job would be any different from that it had been before you took your leave?
>
> *A.* No.

> There is no question of material fact that Clara cannot sustain her claim for breach of contract premised upon constructive discharge.

In discussing defendant's working conditions, the trial court ignored that the nature of defendant's claim was not that she was subject to intolerable working conditions, but rather that she was not being compensated for her work. It should have been axiomatic for the trial court to find that an employee's expectation of compensation is an essential component of an employment relationship, and that refusal to pay an employee as promised can create a working condition that would cause a reasonable person to resign and seek monetary damages. Accordingly, there exists within this record issues of material fact regarding whether defendant was constructively discharged.

The trial court also ruled that dismissal of defendant's breach-of-contract claim was justified because defendant did not identify the number of PTO days that she allegedly failed to receive. The court stated:

> In her Counter-Complaint, Clara does not identify the number of days of PTO she allegedly failed to receive. Clara argues that she "intended to carry over unused PTO to be used for her maternity leave," but the General Medicine Employee Manual only allows up to five unused PTO days to be carried over to the next year.

Notwithstanding the foregoing, Clara never denies receiving or being aware of the 2018 Employee Handbook which "supersedes and replaces all previous handbooks" and specifically reflects that an employee's right to receive PTO is conditional and depends on strictly meeting all of the eligibility and procedural criteria; PTO accrues on a monthly basis; any time off is to be pre-approved; requests for one or more days off must be made by completing and submitting the request form at least 60 days in advance; the Director of Clinical Operations will have final approval; and management reserves the right to use its discretion in determining whether PTO may be granted. Clara did not provide 60 days' notice or receive advance final approval for time off as required by the 2018 Employee Handbook. Instead, Clara advised General Medicine on January 7, 2020 that she was taking her maternity leave immediately. Clara had not yet accrued any PTO to be used during the 20-workday waiting period before her short-term disability became effective. Because no PTO had accrued, Clara was not entitled to PTO under the 2018 Employee Handbook.

Even if Clara is correct that she was entitled to PTO from a source other than the 2018 Employee Handbook, she never timely requested the PTO in violation of the notice requirements for using PTO as set forth in the 2018 Employee Handbook. As such, she was not entitled to carryover PTO in this action.

It was defendant's position that her employment agreement, not the revised employee handbook, controlled the terms of her employment. She argued that plaintiff, as the party relying on the employee handbook to defeat defendant's claim, had the burden of proving that she was subject to the revised employee handbook and had notice that its provisions applied to her employment. As explained earlier, there are questions of fact regarding whether defendant had notice of the revised employee handbook, whether the handbook policy applied to employees in defendant's position, and whether the handbook superseded defendant's employment agreement to the extent that they were inconsistent.

Furthermore, contrary to the trial court's belief that defendant did not provide 60 days' notice of her use of PTO, as stated *supra*, the evidence indicated that defendant notified her supervisor of her anticipated maternity leave in October 2019, more than 60 days before January 2020, and was advised that she would be able to use 20 PTO days before her right to receive short-term disability benefits began. We therefore fail to understand the basis for the trial court's dismissal of defendant's breach-of-contract claim on the ground that there was not sufficient advance notice of defendant's intent to use PTO days or the number of days.

The trial court also ruled that defendant forfeited any right to receive short-term disability benefits because she did not give plaintiff proper notice before terminating her employment. The trial court stated:

Section 4.4 of the Employment Agreements states in part, that "All employee benefits paid or provided by Employer to Employee, whether or not expressly enumerated in this Agreement or Exhibit A, may be retained by Employee only in the event Employee completes (or timely gives notice of non-renewal of) the entire Term of this Agreement during which such benefits were

-23-

paid." Section 7 governing termination states "In the event of just cause termination: (1) Employee will be paid his/her earned but unpaid salary and benefits through the date of termination, subject to offset as provided in Sections 3 and 4.4 . . ."

The Term of the Employment Agreement is "the one year period beginning with the date employee starts work or the expiration date of the previous Term, whichever is later. Upon expiration of the initial Term, this Agreement will automatically renew for successive one-year Terms unless Employee provides written notice of intent not less than 150 days prior to the expiration of the initial Term or any renewal term."

Clara only became eligible for short-term disability on February 4, 2020. She forfeited her short-term disability payments under Section 4.4 of her Employment Agreement by terminating her Employment Agreement without completing her Term and without the required notice.

There is no question of material fact that Clara cannot sustain her claim for breach of contract premised upon her forfeiture of short-term disability.

As explained earlier, there are genuine issues of material fact regarding whether plaintiff first breached the employment agreement and whether defendant was constructively discharged because plaintiff refused to pay promised salary and PTO days before short-term disability benefits began. Accordingly, the trial court erred by ruling that defendant was precluded from maintaining her claim for breach of contract.

For the foregoing reasons, we reverse the portion of the trial court's order granting summary disposition in favor of plaintiff with respect to defendant's counterclaim for breach of contract and remand this matter to the trial court for further proceedings consistent with this opinion.

## C. RESTRICTIVE COVENANTS

Defendant argues that the trial court erred by granting summary disposition in favor of plaintiff on plaintiff's claim that defendant breached her employment agreement by violating the noncompete and nonsolicitation clauses in the agreement. The relevant restrictive covenants provide:

8.1 Non-Solicitation. Employee agrees that while he/she is employed by Employer and for a period of three (3) years following the termination of his/her employment with Employer for any reason (the "***Restricted Period***"), he/she will not, at any time whatsoever, for him/herself, or on behalf of any other party, directly or indirectly, contact, solicit, interfere with, disrupt or attempt to disrupt, or seek to obtain for his/her own benefit, or for the benefit of any third party, any business relationship, arrangements or contracts between Employer and any other party including, without limitation, agreements and relationships with Employer's suppliers, Clients, Client Facilities, Client Patients, agents, representatives, long term care facilities, hospitals, and other parties doing business with Employer. In

addition, at no time during the Restricted Period shall Employee directly or indirectly solicit any of Employer's patients (including Client Patients), or hire or solicit for hire, whether for him/herself or on behalf of any other party, any employee of Employer or any former employee whose employment terminated during the twelve (12) month period immediately preceding such solicitation and/or hire.

\* \* \*

8.3 <u>Covenant Not to Compete</u>. Employee hereby covenants and agrees that during the Restricted Period (defined in section 8.1 above), he/she shall not within twenty (20) miles of any Client and/or Client Facility and/or Client Patient in which or to whom Employer provides services in any manner, directly or indirectly, through intermediaries or other persons or entities, either as owner, shareholder, director, officer, agent, consultant, creditor, representative, investor, partner, employee, or on behalf of any other person or entity, or otherwise, compete with Employer, or engage in any business or enterprise offering any products or services similar to, or competitive with the products and services offered by Employer.

Courts of this state will enforce a noncompetition agreement against a former employee if it complies with MCL 445.774a(1), which provides:

An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

"A court must assess the reasonableness of the noncompetition clause if a party has challenged its enforceability." *Coates*, 276 Mich App at 507-508. The reasonableness of a noncompetition provision is a question of law when the relevant facts are undisputed. *Id.* at 506. Questions of law are reviewed de novo. *Id.*

While contracts are generally presumed to be legal, valid, and enforceable, noncompetition agreements are disfavored as restraints on commerce, and therefore, will be enforced only to the extent that they are reasonable. *Id.* The party who seeks to enforce a noncompete clause has the burden of establishing its validity. *Id.* at 508.

In *Coates*, this Court observed:

[A] restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable. Additionally, a

restrictive covenant must be reasonable as between the parties, and it must not be specially injurious to the public.

Because the prohibition on all competition is in restraint of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition. To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill. [*Coates*, 276 Mich App at 506-507, quoting *St Clair Med, PC v Borgiel,* 270 Mich App 260, 266; 715 NW2d 914 (2006) (citations omitted).]

The trial court did not distinguish between the noncompete clause, § 8.3, and the nonsolicitation clause, § 8.1. Citing *Total Quality, Inc v Fewless*, 332 Mich App 681, 699; 958 NW2d 294 (2020), plaintiff argues that nonsolicitation agreements are not subject to MCL 445.774a(1). In that case, however, this Court merely questioned whether there was a distinction and noted that the defendant in that case did not cite authority that nonsolicitation agreements are subject to MCL 445.774a(1). *Total Quality*, 332 Mich App at 699. Nonetheless, this Court evaluated the nonsolicitation clause under MCL 445.774a(1). *Total Quality*, 332 Mich App at 700. In that case, the defendant argued that the plaintiff did not have a reasonable competitive interest, but this Court recognized that "employers have legitimate business interests in restricting former employees from soliciting their customers," and concluded that "[t]he scope of the activity prohibited is reasonable and allows defendants to compete with [the plaintiff] as long as they do not solicit [the plaintiff's] customers, employees, and business relationships." *Id*. Although MCL 445.774a(1) was adopted to address common-law noncompete agreements, it expressly applies to agreements that protect an "employer's reasonable competitive business," which would include nonsolicitation agreements. Therefore, the trial court did not err by analyzing both clauses under MCL 445.774a(1).

"Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest." *Whirlpool Corp v Burns*, 457 F Supp 2d 806, 812 (WD Mich, 2006). However, "an employee is entitled to the unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable." *Id*., quoting *Follmer Rudzewicz & Co, PC v Kosco*, 420 Mich 394, 402; 362 NW2d 676 (1984) (footnotes omitted). "[C]onfidential information, including information regarding customers, constitutes property of the employer . . . ." *Id*. An employee who possesses confidential information regarding a client is in a position to exploit the information by soliciting clients after leaving his employer's service. *Id*. at 406.

For a geographical limitation in a restrictive covenant to satisfy the standard of reasonableness, the limitation must be no greater than reasonably necessary to protect the employer's legitimate business interests. *Kelly Servs, Inc v Marzullo*, 591 F Supp 2d 924, 939 (ED Mich, 2008). "Courts, applying Michigan law, have routinely upheld non-compete agreements

restricting the former employee from engaging in restricted activities for periods of six months to three years." *Id*.[8]

In *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 157-158; 742 NW2d 409 (2007), this Court held that a two-year restriction on soliciting clients from an accounting firm was reasonable. In *St Clair Med*, 270 Mich App at 266-269, this Court discussed as follows a restrictive covenant in the medical setting, stating:

> In a medical setting, a restrictive covenant can protect against unfair competition by preventing the loss of patients to departing physicians, protecting an employer's investment in specialized training of a physician, or protecting an employer's confidential business information or patient lists. *Community Hosp Group, Inc v More*, 183 NJ 36, 58; 869 A2d 884 (2005); Berg, *Judicial enforcement of covenants not to compete between physicians: Protecting doctors' interests at patients' expense*, 45 Rutgers L R 1, 17-18 (1992).
>
> We agree with defendant that material issues of fact remain regarding whether the covenant was protecting plaintiff's confidential patient lists and business information or plaintiff's investment in defendant's training. The lower court record is contradictory regarding whether defendant had access to confidential business information or patient lists. Plaintiff suggested that defendant had access to confidential information; however, defendant averred that during the course of his employment he was "unaware of potentially confidential information concerning operation of St. Clair Medical as a business such as patient lists, price lists, or the existence or content of any other possibly confidential business information." Accordingly, there are issues of disputed fact regarding whether plaintiff was protecting itself from defendant's use of confidential information or patient lists. Plaintiff also asserted that it "expended substantial resources in training [defendant] to be a successful practitioner, including providing casual advice from other more experienced physicians, access to professional training and seminars, and working knowledge of how a successful practice is run on a day-to-day basis." In *Follmer,* our Supreme Court concluded that " 'general knowledge, skill, or facility acquired through training or experience . . . acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant. . . .' " *Follmer*, *supra* at 402 n 4, quoting Blake, *Employment agreements not to compete*, 73 Harv L R 625, 652 (1960). Here, plaintiff has failed to offer any evidence indicating that defendant benefited from specialized training that he could then use to unfairly compete with plaintiff. Accordingly, we also conclude that there are disputed issues of fact regarding whether plaintiff provided defendant anything other than general training and experience.

---

[8] During the course of oral argument, counsel for plaintiff asserted that they were not enforcing the geographical limitation of the restrictive covenant.

We conclude, nevertheless, that the restrictive covenant was protecting plaintiff's competitive business interest in retaining patients, that it provided plaintiff with time to regain goodwill with its patients, and that it prevented defendant from using patient contacts gained during the course of his employment to unfair advantage in competition with plaintiff. A physician who establishes patient contacts and relationships as the result of the goodwill of his employer's medical practice is in a position to unfairly appropriate that goodwill and thus unfairly compete with a former employer upon departure. See *Weber v Tillman*, 259 Kan 457, 467-469; 913 P2d 84 (1996); Berg, *supra* at 17-18. This risk of unfair competition in this context does not result from access to patient lists, but from the risk that patients will seek to follow a departing physician. Where the physician-patient relationship was facilitated by a physician's association with his employer or resulted from advertising dollars expended by that employer, a physician can unfairly take advantage of the employer's investments in advertising and goodwill when competing with the former employer to retain patients. Here, plaintiff operated clinics located in the cities of Yale, St. Clair, and Port Huron, which drew patients residing throughout St. Clair County. Plaintiff expended funds to advertise its services in these cities. Defendant practiced medicine for plaintiff for approximately 20 months and took advantage of plaintiff's goodwill in the community and advertising expenditures to attract patients. We conclude that the covenant protected plaintiff from unfair competition by defendant and therefore protected a reasonable competitive business interest as required by MCL 445.774a(1).

Defendant next argues that the restrictive covenant is unenforceable because the geographic restriction is unreasonable in relation to plaintiff's competitive interest, i.e., defendant provided the overwhelming majority of his services at the clinic that was more than twenty miles from the location of his new employment. We conclude that the restrictive covenant is modest in geographical scope and is not unreasonable in relation to plaintiff's competitive business interests. The principal shareholder and president of plaintiff corporation stated, "When [defendant] was hired by St. Clair Medical, it was anticipated that he would see patients at both the Greater Yale Medical Clinic and the Mitchell Medical Center." Although defendant worked primarily at one location, there is no evidence that his patients were only drawn from within seven miles of that location. Plaintiff's clinics drew patients residing throughout St. Clair County. Indeed, since defendant's departure, some patients previously scheduled for plaintiff's Yale office have visited plaintiff's Port Huron office. We conclude that a prohibition on practice extending for seven miles around two of plaintiff's offices where it was anticipated that defendant would work is not unreasonable and protects plaintiff's interest in retaining patient goodwill.

The duration of the restrictive covenants in this case, three years, is not unreasonable, given that agreements of up to three years have been deemed to be reasonable. The second factor, however, the geographical restriction, regardless of whether plaintiff intends to enforce it, is too expansive. The covenant not to compete, § 8.3, prohibits defendant from providing services within 20 miles of "any Client and/or Client Facility and/or Client Patient in which or to whom Employer

-28-

provides services in any manner, directly or indirectly . . . ." While a 20-mile restriction does not seem unreasonable on its face, its application to plaintiff's Clients, Client Facilities, and Client Patients substantially broadens the scope of the restriction such that it encompasses almost the entirety of southern Illinois. The restriction measures the 20-mile radius from the location of any client or client facility, and even any patient of any client. The restriction also applies to any location where plaintiff has a business connection, regardless of whether defendant worked at or had any involvement with that connection. Moreover, the restriction extends the scope of the 20-mile limitation to any patient of a client or a client facility, and plaintiff fails to explain how defendant reasonably would be expected to know where each patient of a client lived. Enforcement of this clause would effectively require defendant to relocate if she continued to provide care in the post-hospitalization setting anywhere in southern Illinois. The scope of this geographical limitation as defined in the restriction is unreasonable.

Regarding the next factor, plaintiff's line of business, plaintiff appears to have valid reasons for imposing restrictions against its former employees to protect its client relationships with facilities for which it provides staffing, as explained in *St Clair Med*, 270 Mich App at 266-269. However, considering the timing of the events in this case and the fact that the parties are in the business of providing medical care, we conclude that the restrictive covenants cannot be enforced against defendant.

Defendant is not in direct competition with plaintiff's business because defendant does not operate a staffing agency, but she is working for facilities that could have hired staff through plaintiff. Defendant's husband has also obtained positions at facilities that could have hired staff through plaintiff. Therefore, even though defendant is not in the business of providing staffing services, there is evidence that she is serving plaintiff's clients. Thus, the facts show that defendant is in competition with plaintiff. But the covenants cannot merely restrict competition. Defendant argues that the evidence failed to show that the restrictive covenants protect plaintiff's reasonable competitive business interests, as required by MCL 445.774a(1). This requires that defendant must have gained some unfair advantage in competition with plaintiff, beyond merely using her general knowledge or skills in the same field. *Coates*, 276 Mich App at 506-507. We disagree with the trial court's ruling that the restrictive covenants are reasonable in this regard.

Plaintiff does not adequately explain how defendant's employment through its agency has given her an unfair advantage in competing with plaintiff. From the record it becomes clear that the noncompete and nonsolicitation clauses are unenforceable to the extent that they are simply meant to keep defendant, as a former employee, from working in a new position on her own and not through plaintiff's agency. Plaintiff has the burden of proving the validity of its restrictions. *Coates*, 276 Mich App at 508. Plaintiff has not persuasively explained how the restrictive covenants protect its business interests, other than eliminating competition, to demonstrate that either restriction qualifies as reasonable.

Evaluating the reasonableness of a noncompetition agreement is "inherently fact-specific." But reasonableness of a noncompetition agreement is a question of law when the facts are not in dispute. *Innovation Ventures*, 499 Mich at 507. In *St Clair Med*, 270 Mich App at 265-266, this Court explained that the reasonableness of a noncompetition agreement includes consideration of whether the agreement would be injurious to the public. In this case, enforcement of plaintiff's restrictions against defendant does not meet the test of "reasonableness" because plaintiff was

seeking to keep defendant from working as a nurse practitioner at the type of facilities where she had spent the last few years working and to also prevent defendant from helping her husband obtain new positions as a medical director or attending physician at such facilities. We note that the time period involved in this case was at the height of the COVID pandemic when there were an inadequate number of qualified medical personnel. Enforcing these restrictions would be injurious to the public by preventing defendant from working throughout the entire pandemic despite medical staffing shortages. Accordingly, the reasonableness and purpose of plaintiff's restrictive covenants are brought into question. On this record, we conclude that the restrictive covenants were not reasonable and should not be enforced under the unique circumstances of this case, namely providing urgently needed medical care during a pandemic. Accordingly, we reverse the trial court's order granting summary disposition in favor of plaintiff on plaintiff's breach-of-contract claim and remand for an entry of an order of summary disposition in favor of defendant on this claim.[9]

## D. DEFENDANT'S BREACH OF CONTRACT

Defendant next argues that the trial court erred in granting summary disposition of plaintiff's claim for breach of contract. Plaintiff claimed that defendant breached the employment agreement by violating the restrictive covenants. As discussed above, we conclude that those covenants are unenforceable in this case, given the unique facts of this case and the timing of plaintiff's efforts to prevent defendant from working in the medical profession. Given that conclusion, we need not address whether plaintiff met its burden in proving that there was no genuine issue of material fact on whether defendant breached the restrictive covenants by obtaining employment at facilities within a 20-mile radius of facilities where plaintiff had business relationships or helping her husband solicit employment at facilities associated with plaintiff.

## E. DEFENDANT'S PREGNANCY-DISCRIMINATION CLAIM

Defendant argues that the trial court erred by dismissing her pregnancy-discrimination claim under MCR 2.116(C)(10). In its motion for summary disposition, plaintiff argued that there was no evidence, direct or indirect, that it discriminated against defendant because of her pregnancy. Plaintiff argued that defendant's reliance on a hearsay statement by Melinda Johnson did not support defendant's discrimination claim because Johnson was a subordinate, her comment was merely a stray remark made months before defendant's maternity leave, Johnson was not a decisionmaker with respect to whether defendant would receive PTO or short-term disability benefits, and the comment did not relate at all to defendant's maternity leave and benefits. Plaintiff also argued that there was no evidence that defendant was treated differently than other similarly situated employees, pregnant or otherwise.

In response, defendant argued that plaintiff discriminated against her by changing its corporate policy and offering a wholly illusory maternity leave policy, which was targeted at her because of her pregnancy. Defendant argued that the terms of her employment agreement entitled her to 30 days of PTO, without restrictions. Furthermore, plaintiff's original employee handbook allowed for five unused PTO days to carry over to the next year, and that handbook did not address

---

[9] In light of this holding, it is unnecessary to address defendant's additional arguments.

the accrual of PTO days. According to defendant, plaintiff discriminated against her by not allowing her to carry over PTO days and not allowing her to use PTO days in accordance with her employment agreement. Instead, plaintiff maintained that a revised employee handbook prohibited PTO days from being used before they accrued or from being carried over for employees in defendant's position, but there was no evidence that defendant was provided with a copy of the new handbook or otherwise advised of these changes. Defendant believed that the changes to plaintiff's employment policies were targeted at her and her pregnancy. Defendant also argued that the maternity leave promised to her was wholly illusory because a woman could qualify for paid leave only if her child were born after May.

The trial court found that the evidence did not support defendant's pregnancy-discrimination claim, stating:

> Here, there is no direct or indirect evidence of discrimination. In her February 27, 2020 letter terminating her employment, Clara did not allege discrimination. Clara has proffered no evidence that the Plaintiff changed its corporate policy targeted at Clara's employment on the basis of her pregnancy. In short, Clara has presented no evidence that the Plaintiff's policies are discriminatory or that the Plaintiff discriminated against her on the basis of her pregnancy. In fact, Clara admits the Plaintiff never suggested her position would change after she returned from maternity leave. Clara also admits she has no evidence that her pregnancy was a motivating factor in her not being paid:
>
> > *Q*. Okay. So that's my question. Do you have any—other than the mere fact that you were pregnant, do you have any evidence that pregnancy was the motivating factor in them not paying you?
> >
> > *A*. I was not paid prior—I was not paid after being pregnant. Up until the point I went on maternity leave, I was paid every month.
>
> Furthermore, Clara has not presented any evidence of harassment. Despite Clara's repeated claims that "they knew she was in the hospital["] and "they ganged up on her," Clara acknowledges she never told the Plaintiff that she was in the ICU when she made the February 17, 2020 phone call and she does not remember what was allegedly harassing about the phone call or what was even said during the phone call. Clara claims nurse practitioner Melinda Johnson made negative comments about her pregnancy to the director [of] nursing at Willow Creek, but the comments were not made directly to Clara and Clara never heard the comments. In fact, Clara heard about the comments after she had already terminated her employment and Clara admits she is not aware of any other negative comments being made. There is no evidence to support that the Plaintiff harassed or discriminated against Clara due to her pregnancy.

The ELCRA prohibits employers from discriminating against employees on the basis of pregnancy. MCL 37.2201(d); MCL 37.2202(1). In her counterclaim, defendant alleged that plaintiff violated the ELCRA "by discriminating with respect to the terms, conditions and privileges of her employment on the basis of her pregnancy." She alleged that plaintiff harassed

and retaliated against her because she was pregnant and took maternity leave. She further claimed that her pregnancy and maternity leave were motivating factors in the manner in which she was treated, including not paying her compensation as agreed and constructively discharging her from employment.

A plaintiff may prove discrimination using direct or indirect evidence. *Sniecinski v Blue Cross & Blue Shield of Mich,* 469 Mich 124, 132; 666 NW2d 186 (2003). Direct evidence of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 133 (internal quotation marks and citations omitted). In cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden-shifting approach from *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). As our Supreme Court explained in *Sniecinski*, 469 Mich at 134:

> This approach allows "a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination. Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination. [Citations and footnote omitted; emphasis in original).]

A plaintiff can prove pretext either directly by showing that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Roulston v Tendercare, Inc*, 239 Mich App 270, 281; 608 NW2d 525 (2000).

> A "mere pretext" may be proved (1) by showing that the reason(s) had no basis in fact, (2) if the reason(s) had a basis in fact, by showing that they were not actual factors motivating the decision, or (3) if the reason(s) were motivating factors, by showing that they were jointly insufficient to justify the decision. *Dubey v Stroh Brewery Co*, 185 Mich App 561, 565-566; 462 NW2d 758 (1990). However, the soundness of an employer's business judgment may not be questioned as a means of showing pretext. *Id*. at 566. Moreover, unfairness will not afford a plaintiff a remedy unless the unfair treatment was because of . . . discrimination. [*Meagher v Wayne State Univ,* 222 Mich App 700, 712; 565 NW2d 401 (1997).]

Defendant was a member of a protected class because of her pregnancy, and she presented evidence that she was denied pay and benefits as promised because of her pregnancy-related maternity leave, which led to her constructive discharge. A denial of employment benefits and

termination of employment are considered adverse employment actions. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 312; 660 NW2d 351 (2003).

The trial court did not give much, if any, consideration to defendant's arguments that plaintiff's refusal to pay her salary and benefits as promised during her maternity leave was indirect evidence of discrimination because of her pregnancy. Although plaintiff emphasizes that defendant never informed it that she believed she was being discriminated against because of her pregnancy when she accused plaintiff of breaching her employment agreement, defendant presented evidence that she left her employment because she did not receive promised benefits and pay during her maternity leave. Whether defendant expressly informed plaintiff that she believed that she was being discriminated against because of her pregnancy in her letter of resignation is not dispositive of whether she was a victim of discrimination.

Defendant's employment agreement provided that she would receive 30 PTO days each year and did not address accrual. Further, defendant was told in October 2019 that, when she began her anticipated maternity leave in early 2020, she could use 20 PTO days for the 20-day waiting period before becoming eligible to receive short-term disability benefits. Plaintiff offered testimony that Coccia incorrectly advised defendant about her PTO usage because PTO days could not be used before they accrued. Plaintiff also denied that defendant could carry over any unused PTO from 2019 under the terms of her employment agreement. Plaintiff maintained that defendant would have to wait 20 days, without receiving pay, before she would be eligible to receive short-term disability benefits while on maternity leave.

Coccia's e-mail to defendant approved her use of PTO days during her anticipated maternity leave and quoted portions of the 2018 handbook when approving defendant's use of PTO days for the 20-day waiting period. Plaintiff's maternity policy is based on the short-term disability policy. The maternity policy is not discriminatory with regard to the use of PTO time because it is based on the short-term disability policy, and the short-term disability policy's requirement of a 20-day waiting period applies equally to men and women employees who are not pregnant, but who take a medical leave of absence for reasons unrelated to pregnancy. While defendant contends that the maternity leave policy has a discriminatory effect and is illusory, that question is not at issue in these proceedings. Rather, defendant claims that plaintiff changed its employment policies regarding PTO usage solely in response to her pregnancy. Defendant alleges that plaintiff relied on the 2018 version of its employee handbook, with changes made to the accrual and carryover of PTO, to keep her from using PTO for her maternity leave, but defendant maintains that she was allowed to carry over her PTO time in the past. More significantly, Coccia's October 2019 e-mail informed her that she could use her 2020 PTO for her maternity leave in early 2020, before it accrued and before the short-term disability benefits were available. Defendant claims that plaintiff relied on the changes to its employment policies, which were specifically directed at her position as a clinical coordinator, to advance its position that she was not entitled to any PTO time during her maternity leave, but that plaintiff's employee handbook primarily addressed nursing staff and physicians and did not control the terms of her employment with regard to benefits.

Review of this record evidence leads us to conclude that defendant presented evidence that plaintiff changed its policies in response to her request for maternity leave. As discussed earlier, there are questions of fact regarding whether plaintiff's PTO policies, as set forth in the employee

handbooks, were intended to apply to clinical coordinators, like defendant. If plaintiff changed or enforced employee policies in a manner that effectively targeted only defendant's right to PTO usage in response to her maternity leave and pregnancy, it would support an inference of discrimination.

Defendant's discrimination claim is dependent on her argument that she should have been able to carry over PTO time from 2019 to 2020. On this point, again, there is a question of fact regarding the nature of plaintiff's PTO policy as applied to clinical coordinators, whether that policy was changed, and whether the change was communicated to defendant.

As previously explained, there are genuine issues of material fact regarding whether plaintiff discriminated against defendant because of her pregnancy by making changes to its PTO policies after learning of defendant's pregnancy and maternity leave. Therefore, we reverse the trial court's dismissal of plaintiff's pregnancy-discrimination claim.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full, no costs are awarded. MCR 7.219.

/s/ Mark T. Boonstra
/s/ Stephen L. Borrello
/s/ Kathleen A. Feeney